UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RYAN MELVILLE, on behalf of himself and
all others similarly situated,

                                    Plaintiffs,

            v.

HOP ENERGY, LLC,

                                    Defendant.

No. 21-CV-10406 (KMK)

OPINION & ORDER

---

Appearances:

J. Burkett McInturff, Esq.
Wittels McInturff Palikovic
Armonk, NY
*Counsel for Plaintiffs*

Jonathan Shub, Esq.
Shub Law Firm LLC
Haddonfield, NJ
*Counsel for Plaintiffs*

William M. Moran, Esq.
Otterbourg P.C.
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

        Ryan Melville ("Plaintiff") brings this Action, on his own behalf and on behalf of a

putative class, asserting claims against HOP Energy, LLC ("Defendant"), for breach of contract

and breach of the implied covenant of good faith.  (*See generally* Compl. (Dkt. No. 1).)  Plaintiff

claims that Defendant breached the promises it purportedly made when contracting to provide

"our Promotional Prevailing Retail Price for First Year Customers" when it charged prices that

were allegedly higher than the prevailing retail price in the industry.  (*See generally id*.)  Before

the Court is Defendant's Motion To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").  (Not. of Mot. (Dkt. No. 13).)  For the following reasons, the Motion is denied.

I.  Background

A.  Factual Background

1.  Incidents Giving Rise to this Action

On October 19, 2018, Plaintiff, a Connecticut resident and citizen, signed a contract ("Contract") with Defendant, a company incorporated in Delaware with its principal place of business in New York, for the supply of home heating oil.  (Compl. ¶¶ 6, 37–38.)  The Contract is a "nonnegotiable standardized form contract drafted by [Defendant]."  (*Id*. ¶ 6.)  Under the Contract, Plaintiff was initially enrolled in a "capped-price" plan.  (*Id*. ¶¶ 6–7.)  Under the terms of this plan, Defendant would provide home heating oil at a capped price either from the "Pricing Period" of October 19, 2018 through October 31, 2019 or until 1,000 gallons of oil had been delivered, whichever came sooner.  (*Id*. ¶ 7.)  After the expiration of the Pricing Period or once 1,000 gallons of oil had been delivered, the Contract stipulated that "[a]ll subsequent deliveries to you will be charged at our Promotional Prevailing Retail Price for First Year Customers for home heating oil that is in effect at the time of delivery."  (*Id*.)

The "TERMINATION" section of the Contract provides that "[a]fter the Pricing Period, either party may terminate this Agreement upon written notice, provided that you will remain responsible for all purchases made by you before we received notice of the cancellation."  (*Id*. ¶ 9.)  The "TERMINATION" section then states that "[a]ny gallons delivered to you after the Pricing Period has expired will be charged at our PROMOTIONAL PREVAILING RETAIL

2

PRICE FOR FIRST YEAR CUSTOMERS for home heating oil that is in effect at the time of delivery." (*Id.*) (emphasis in original).

The Contract also included two copies of a "NOTICE OF CANCELLATION" that could be used to terminate the Contract. (*Id.* ¶ 10.) The Contract stated that a $200 or early termination fee would apply if a consumer's "account is canceled or terminated" during the Pricing Period. (*Id.* ¶ 11.)

The Contract stated "[i]f you think your bill is wrong . . . write us on a separate sheet at the address listed on your bill as soon as possible. We must hear from you not later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights." (Compl. Ex. A at 4.)

On October 14, 2019, Defendant emailed Plaintiff a letter advising him that as of October 31, 2019, the Pricing Period would end and that "if we don't hear from you, your account will automatically default to the Variable Price Plan." (Compl. ¶ 12.) The letter stated that with the "Variable Price Plan . . . our prevailing retail price fluctuates as the cost of oil changes. A pricing agreement is not required for this plan." (Compl. Ex. B.) "Plaintiff [] took no action and in accordance with the Agreement, [Defendant] continued to deliver his home heating oil until he canceled his contract with [Defendant] in April 2021." (Compl. ¶ 13.)

## 2. Expert Calculations

Plaintiff commissioned a price comparison analysis from "energy consulting experts" which compared Defendant's rates—taken from Plaintiff's invoices—and the weekly residential heating oil price data between November 2019 and April 2021 published by the Department of Energy and Environmental Protection ("DEEP") of the State of Connecticut and the United States Energy Information Administration ("EIA"). (*Id.* ¶¶ 15–16, 19.) Plaintiff alleges the

3

analysis "demonstrates that in the 18 months that Plaintiff remained" a customer after October 31, 2019, Defendant's per gallon rates were "higher than the prevailing retail price" 100% of the time.  (*Id.* ¶ 15.)  Plaintiff further alleges that Defendant's prices were on average between 42% and 46% higher than the prevailing retail rate charged for the exact same heating oil.  (*Id.*)  The results of this analysis have been summarized by Plaintiff in the following graph and tables:



(*Id.* ¶ 20.)  Plaintiff alleges this graph demonstrates that "the three separate sources of public pricing data are highly consistent" and that the prices Defendant charged Plaintiff "are substantially higher than these three sources and thus do not reflect the 'Promotional Prevailing Retail Price for First Year Customers.'"  (*Id.* ¶ 22.)

| | | **Table 1:  HOP Energy Heating Oil Prices vs. Public Reports** | | |
| | | **(Prices are in $ per gallon)** | | |
| **Date Delivered** | **HOP Energy Prices** | **Average Residential Connecticut (DEEP)** | **Average Residential Retail Connecticut (EIA)** | **Average Residential Retail New England (EIA)** |
|---|---|---|---|---|
| | [a] | [b] | [c] | [d] |
| 11/23/2019 | $4.20 | $2.81 | $2.99 | $2.89 |
| 2/6/2020 | $4.00 | $2.74 | $2.89 | $2.86 |
| 2/28/2020 | $4.00 | $2.66 | $2.85 | $2.81 |
| 3/26/2020 | $3.00 | $2.15 | $2.28 | $2.38 |
| 4/23/2020 | $2.50 | $1.90 | | |
| 5/27/2020 | $2.50 | $1.84 | | |
| 8/11/2020 | $2.70 | $2.03 | | |
| 9/28/2020 | $2.70 | $1.97 | | |
| 11/10/2020 | $2.70 | $1.99 | $2.07 | $2.06 |
| 12/9/2020 | $3.20 | $2.17 | $2.26 | $2.23 |
| 1/4/2021 | $3.60 | $2.35 | $2.45 | $2.40 |
| 1/23/2021 | $3.90 | $2.43 | $2.54 | $2.51 |
| 2/16/2021 | $4.10 | $2.68 | $2.77 | $2.72 |
| 3/9/2021 | $4.30 | $2.80 | $2.90 | $2.84 |
| 4/6/2021 | $4.40 | $2.71 | | |
| Min | $2.50 | $1.84 | $2.07 | $2.06 |
| Average | $3.45 | $2.35 | $2.60 | $2.57 |
| Max | $4.40 | $2.81 | $2.99 | $2.89 |

(*Id*. ¶ 23.)  Plaintiff's Table 1 compares the price information from Plaintiff's invoices on specific dates with the corresponding public reports.  (*Id*.)  Plaintiff alleges that Table 1 indicates that the average price charged by Defendant was $3.45 per gallon while the average residential heating oil prices were $2.35 per gallon and $2.60 per gallon according to the DEEP and EIA reports, respectively.  (*Id*. ¶ 24.)  The lowest price Defendant charged Plaintiff was $2.50 per gallon which was approximately 36% and 21% higher than the lowest price reported by DEEP and EIA, respectively.  (*Id*.)  Finally, the highest price charged by Defendant was $4.40 per gallon which was approximately 56% higher than the highest price reported by DEEP and approximately 47% higher than the highest price reported by EIA.  (*Id*.)

| Table 2: Percent Overcharge from Public Reports to HOP Energy Heating Oil Prices (Prices are in $ per gallon) | | | | |
|---|---|---|---|---|
| Date Delivered | HOP Energy Price Per Gallon | HOP Energy % Overcharge Above Avg. Residential Connecticut (DEEP) Price Per Gallon | HOP Energy % Overcharge Above Avg. Residential Retail Connecticut (EIA) Price Per Gallon | HOP Energy % Overcharge Above Avg. Residential Retail New England (EIA) Price Per Gallon |
| | [a] | [b] | [c] | [d] |
| 11/23/2019 | $4.20 | 49% | 40% | 45% |
| 2/6/2020 | $4.00 | 46% | 38% | 40% |
| 2/28/2020 | $4.00 | 50% | 40% | 42% |
| 3/26/2020 | $3.00 | 40% | 32% | 26% |
| 4/23/2020 | $2.50 | 32% | | |
| 5/27/2020 | $2.50 | 36% | | |
| 8/11/2020 | $2.70 | 33% | | |
| 9/28/2020 | $2.70 | 37% | | |
| 11/10/2020 | $2.70 | 35% | 31% | 31% |
| 12/9/2020 | $3.20 | 47% | 42% | 44% |
| 1/4/2021 | $3.60 | 53% | 47% | 50% |
| 1/23/2021 | $3.90 | 60% | 54% | 55% |
| 2/16/2021 | $4.10 | 53% | 48% | 51% |
| 3/9/2021 | $4.30 | 53% | 48% | 51% |
| 4/6/2021 | $4.40 | 62% | | |
| Min | $2.50 | 32% | 31% | 26% |
| Average | $3.45 | 46% | 42% | 44% |
| Max | $4.40 | 62% | 54% | 55% |

(*Id.* ¶ 25.)  Table 2 shows "the percentage overcharge from the prevailing retail prices reflected in the public reports to [Defendant's] prices when it sold home heating oil to Plaintiff after October 31, 2019."  (*Id.*)  Plaintiff alleges that Table 2 demonstrates that during the winter of 2019 to 2020, Defendant's prices were approximately 40% to 50% higher than the average DEEP residential heating oil prices and 32% to 40% higher than the average EIA residential heating oil prices in Connecticut.  (*Id.* ¶ 26.)  During the winter of 2020 to 2021, Defendant's prices were approximately 35% to 60% higher than the average DEEP residential heating oil prices and 31% to 54% higher than the average EIA residential heating oil prices in Connecticut. (*Id.*)  Finally, Defendant charged Plaintiff on average 42% to 44% higher than the regional

6

residential heating oil prices reported by EIA during the winters of 2019 to 2020 and 2020 to 2021.  (*Id*.)

### 3.  Class Allegations

Plaintiff alleges that he brings this Action on behalf of all of Defendant's customers in Connecticut, Delaware, Massachusetts, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont (including customers of companies Defendant acts as a successor to) "who purchased heating oil during the applicable statute of limitation period up to and including the date of judgment pursuant to contractual pricing terms that tied [Defendant's] prices to prevailing retail prices at the time of delivery."  (*Id*. ¶ 42.)

### B.  Procedural History

Plaintiff filed his Complaint on December 6, 2021.  (Dkt. No. 1.)  Defendant filed the instant Motion and an accompanying Memorandum of Law on April 18, 2022.  (*See* Not. of Mot. (Dkt. No. 13); Decl. of David Mercado in Supp. of Mot. (Dkt. No. 14); Mem. of Law in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 15).)  Plaintiff filed his Opposition on May 18, 2022.  (*See* Mem. of Law for Reply to Mot. to Dismiss ("Pl.'s Mem.") (Dkt. No. 18).)  Defendant filed a Reply on June 1, 2022.  (*See* Reply to Mot. ("Def.'s Reply Mem.") (Dkt. No. 19).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S.  544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure

"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570. However, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, as noted, "[i]n adjudicating a Rule

12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

    B.  Analysis

        1.  Choice of Law

Because "jurisdiction is predicated on diversity of citizenship," the Court "must apply the choice-of-law rules of the forum state." *Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015) (citing, inter alia, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018) ("At the outset of its analysis, a federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state.") (alteration, quotation marks, and citation omitted).  "[I]n the absence of a choice-of-law provision, New York applies a "center of gravity" approach to contract cases[.]" *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *15 (S.D.N.Y. June 6, 2022) (citation omitted).  "In adjudicating the choice of law for a contract dispute, the New York Court of Appeals looks to 'five generally significant contacts': 'the place[s] of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties.'" *United States v. Moseley*, 980 F.3d 9, 23 (2d Cir. 2020) (alteration in original) (quoting *Matter of Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936, 940 (N.Y. 1993).  "The traditional choice of law factors—the places of contracting and performance—are given heavy weight in this analysis." *Id.* (quotation marks and citation omitted).

There is no choice of law provision in the Contract.  (Compl. Ex. A.)  The Parties have provided no briefing on the choice of law and instead have cited to both New York and Connecticut law.  (*See generally* Def.'s Mem.; Pl.'s Mem.; Def.'s Reply Mem.)  "Because a choice of law analysis is fact intensive, courts often decline to make a choice of law determination at the motion to dismiss stage."  *Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 530 F. Supp. 3d 447, 452 (S.D.N.Y. 2021), *reconsideration denied*, No. 19-CV-6957, 2022 WL 889209 (S.D.N.Y. Mar. 25, 2022) (alteration, quotation marks, and citation omitted).  "Declining to engage in a choice of law analysis is especially appropriate," where, like here, "the parties have failed to brief the question."  *Walker v. Thompson*, 404 F. Supp. 3d 819, 823 n.3 (S.D.N.Y. 2019).

Here, the Court will not engage in an analysis of whether New York or Connecticut law applies, because the Court "need not make a choice-of-law determination" where "under both states' regimes, the applicable legal principles are aligned."  *MBIA Inc. v. Fed. Ins. Co.*, 652 F.3d 152, 158 (2d Cir. 2011) (holding that choice of law determination was unnecessary because contract interpretation under ordinary common law contract principles under either New York or Connecticut state law were aligned).  Because "basic contract law principles are necessary for resolving this dispute, and the Court sees no variation in the states['] laws that would impact the analysis, the Court will resolve this motion applying New York law."  *Hertz Glob. Holdings, Inc.*, 530 F. Supp. 3d at 453.[1]

---

[1] Defendant notes in a footnote that because heating oil is a good, Plaintiff "arguably should have asserted his claim under the U.C.C., rather than under common law."  (Def.'s Mem. 23.)  While true, "the relevant elements of the N[.]Y. UCC and the common law [contract] claims are generally synchronous."  *Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC*, No. 22-CV-57, 2022 WL 2905368, at *5 (S.D.N.Y. July 22, 2022).  Under the common law, a cause of action for breach of contract requires "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4)

2.  Breach of Contract

"[T]o state validly a breach of contract claim under New York law, 'a plaintiff need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Fort Prods., Inc. v. Men's Med. Clinic, LLC*, No. 15-CV-376, 2016 WL 797577, at *2 (S.D.N.Y. Feb. 23, 2016) (italics omitted) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).  "At the motion to dismiss stage, a breach of contract claim may be dismissed if a contract unambiguously authorizes the defendant's alleged conduct." *Chambers v. HSBC Bank USA, N.A.*, No. 19-CV-10436, 2020 WL 7261155, at *3 (S.D.N.Y. Dec. 10, 2020). Any contractual ambiguities must be resolved in the plaintiff's favor. *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).  Contractual terms are unambiguous if they have "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Met. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (quotation marks and citation omitted). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 316 (2d Cir. 2006) (internal quotation marks and citation omitted).  Whether a contract is ambiguous is a question of law for the court to decide. *Law*

---

damages." *Id*. (quotation marks and citation omitted).  This test "is the same as that under the N.Y. UCC." *Id*. (quotation marks and citation omitted).

*Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465–66 (2d Cir. 2010) (citations omitted).

In determining the meaning of a contract, the Court "look[s] to all corners of the document rather than view[ing] sentences or clauses in isolation[.]" *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989) (quotation marks and citation omitted). "[A] contract should be read to give effect to all of its provisions, and courts should avoid interpretations that render contract terms meaningless or superfluous." *Meehancombs Glob. Credit Opportunities Master Fund, LP v. Caesars Ent. Corp.*, 162 F. Supp. 3d 200, 210 (S.D.N.Y. 2015). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). In other words, the Court's "primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Bolt Elec., Inc. v. City of N.Y.*, 223 F.3d 146, 150 (2d Cir. 2000). "Parol evidence—evidence outside a contract's four corners—is not admissible unless the court determines that the contract is facially ambiguous." *Barker v. Bancorp, Inc.*, No. 21-CV-869, 2022 WL 595954, at *8 (S.D.N.Y. Feb. 25, 2022).

As a preliminary matter, the Court must determine whether it can consider parol evidence because the Contract terms are ambiguous. Unlike the "Capped Price Program" which is explicitly defined, nowhere in the Contract is there any definition of what constitutes Defendant's "Promotional Prevailing Retail Price." (Compl. Ex. A at 1.)[2] The Contract simply

---

[2] The Contract explains that under the Capped Price Program, the price of heating oil will not exceed $3.049 per gallon, plus applicable taxes. (Compl. Ex. A at 1.) It explains that the "underlying wholesale cost of your Capped Price is based on the previous day's New Haven, CT - Average Rack Price." (*Id.*) If the Rack Price "on the date of your delivery is below the Rack Price on the date of this agreement . . . then your price for the delivery will be the Capped Price set forth above less the difference between the price of the Rack Price at the date of this Agreement and the Rack Price on the date of your delivery." (*Id.*) However, if "the Rack Price

states that Plaintiff "will be charged at our Promotional Prevailing Retail Price for First Year Customers for home heating oil that is in effect at the time of delivery."  (*Id.*)

Defendant points to *Nieves v. Just Energy N.Y. Corp*, No. 17-CV-561S, 2020 WL 6803056 (W.D.N.Y. Nov. 19, 2020) to argue this phrase is unambiguous.  (Def.'s Reply Mem. 3.)  In *Nieves,* the court held that the term "business and market conditions" in the Terms and Conditions section of a contract that read: "Changes to the Variable Rate will be determined by Just Energy according to business and market conditions and will not increase more than 35% over the rate from the previous billing cycle" was not ambiguous despite the absence of a definition of "business and market conditions" because "[b]y its terms, defendant determines the relevant business and market conditions and sets the variable rate accordingly."  2020 WL 6803056, at *4.  However unlike in *Nieves*, here, it is not clear from the language in the Contract that Defendant reserves for itself the same discretionary latitude.  The word "prevailing" can be defined both as "widespread in a particular area at a particular time" and "current."  *See prevail*, encyclopedia.com, https://www.encyclopedia.com/humanities/dictionaries-thesauruses-pictures-and-press-releases/prevail (last visited Mar. 3, 2023); *prevailing*, dictionary.cambridge.org https://dictionary.cambridge.org/us/dictionary/english/prevailing (defining prevailing as "existing in a particular place or at a particular time") (last visited Mar. 3, 2023); *prevail*, https://www.merriam-webster.com/dictionary/prevail (defining prevail as "to be or continue in use or fashion") (last visited Mar. 3, 2023); *see also Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (noting that "it is common practice for the courts of New York State to refer to the dictionary to determine the plain and ordinary meaning of words to a

---

on the date of your delivery is above the Rack Price on the date of this Agreement, then your price for the delivery will be the Capped Price."  (*Id.*)

contract" (alterations, quotation marks, and citation omitted)).  Accordingly, the phrase "our Promotional Prevailing Retail Price" could very well indicate to consumers that Defendant's "promotional" price either 1) was related to the prevailing retail price in the region or 2) referred to Defendant's "current" retail price.  If interpreted as the former, Defendant would not retain the discretionary latitude the contract language in *Nieves* afforded, as the price would be linked to the prevailing retail price in the region.

Because "our Promotional Prevailing Retail Price" is subject to multiple reasonable interpretations, one of which does not afford Defendant unambiguous discretion, the Court considers the letter sent to Plaintiff on October 14, 2019 which states that under the "variable price plan . . . our prevailing retail price fluctuates as the cost of oil changes."  (Compl. Ex. B.)

Plaintiff alleges that Defendant violated the Contract by charging prices that were at times 50% higher than average Connecticut heating oil prices.  (*See generally* Pls.' Mem.)  To support his allegation that Defendant did not abide by the Contract, Plaintiff offers numerical comparisons of Defendant's rate to the average rates for residential heating oil prices in Connecticut and New England.  (*See generally* Compl.)

The Second Circuit has recently addressed contracts of independent energy supply companies ("ESCOs") and valid comparators in several cases, and this Court has previously described the contracts in these cases as "goalposts" which other contracts may fall nearer to or farther from based upon their language.  *Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 425 (S.D.N.Y. 2020).  In *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88 (2d Cir. 2019), the Second Circuit affirmed a district court's decision to grant summary judgment to a defendant in a case that made breach of contract and breach of good faith and fair dealing claims regarding ESCO contracts in Connecticut.  *Id.* at 96.  In that case, the Second Circuit noted that

the defendant did not breach its contract to the plaintiff in part because the contract stated that the defendant "had 'discretion' to set the variable rate 'based upon business and market conditions.'" *Id*. at 98 (citation omitted).  The Second Circuit reasoned that that clause could not have suggested to any reasonable customer that "the variable rate [must] bear[] a direct relationship to [defendant's] procurement costs." *Id*.  The Second Circuit went on to opine that there could be no breach of good faith and fair dealing, either, because "the entire point of electricity deregulation was to allow the market, rather than [Connecticut's utility regulatory authority], to determine rates." *Id*. at 99 (footnote omitted).  Therefore, it would be illogical to measure defendant's pricing against local utility rates where the plaintiff had contracted for a "variable rate set at [defendant's] discretion," especially where the plaintiff "voluntarily chose this contract after considering more than forty competitor options because he thought it was the best available." *Id*. at 99–100 (citation omitted).

However, a few months later, in *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173 (2d Cir. 2019), the Second Circuit reversed a district court's grant of a motion to dismiss and denial of leave to amend a complaint that alleged that an ESCO breached its promise to provide a monthly variable rate "based on [the defendant's] actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." *Id.* at 175 (citation and emphasis omitted).  There, the Second Circuit held that the plaintiffs had plausibly alleged, through "expert calculations . . . [, which] relied on publicly available NYISO data," the existence of utility rates that materially deviated from the defendant's Market Supply Cost.  *Id*. at 177.  In that holding, the Second Circuit also acknowledged that pleading deviations from rates charged by the local New York City utility company could be "another reflection of the Market Supply Cost."  *Id*. at 178 & n.2 (citation omitted).

Defendant argues that the inclusion of the word "'our' unambiguously gave [Defendant] unfettered discretion as to pricing" and accordingly, this case is analogous to *Richards*.  (Def.'s Mem 18.)  Indeed, Defendant argues that the word "our" unambiguously "makes clear that the average price charged by other retail sellers of residential heating oil are irrelevant."  (Def.'s Mem. 13.)  Plaintiff argues that Defendant's interpretation renders the terms "Promotional Prevailing Retail Price" meaningless, as the phrase "Promotional Prevailing Retail Price" is best interpreted as "the prevailing retail price for oil in Plaintiff's location plus a meaningful discount."  (Pl.'s Mem. 13.)

As in *Stanley*, "the facts of this case fall somewhere between the two Second Circuit goalposts described above."  466 F. Supp. 3d at 425 (noting that while defendant never "specifically promised that its monthly variable rate would be based on actual and estimated supply costs" it also did not "explicitly state that the variable rate would be subject to defendant's discretion or that it may be higher or lower each month based upon business and market conditions") (alterations, quotation marks, and citation omitted)).  Unlike in *Mirkin*, the Contract does not specifically promise that the rate would be based on "actual and estimated supply costs" and the use of the word "our" does indicate some level of discretionary price setting.  931 F.3d at 175.  However, unlike in *Richards*, Defendant does tie the Contract price to the cost of oil by stating that Defendant's price fluctuates with the cost of oil and includes the phrase "Prevailing Retail Price."

This Court agrees with Defendant that the use of the word "our" indicates that Defendant was not agreeing to deliver heating oil at *the* prevailing retail price for oil in Plaintiff's location, but rather at *its* "Promotional Prevailing Retail Price."  (Def.'s Reply Mem. 5.)  However, the Court is not persuaded that the term "our" in this context unambiguously confers the same

unfettered discretion as the phrasing in *Richards* which explicitly stated that the ESCO maintained the "discretion" to set the variable rate "based on business and market conditions," *Richards*, 915 F.3d at 98, or the phrasing in *Nieves*, which stated the rate would be "determined" by the defendant "according to business and market conditions"—the same phrasing sanctioned by the *Richards* court, *Nieves*, 2020 WL 6803056, at *4. Unlike in *Richards* and *Nieves*, Defendant utilized the phrase "our Promotional Prevailing Retail Price" which is subject to interpretations that do not confer unfettered discretion. "Promotional" is defined by Merriam-Webster as "the act of furthering the growth or development of something" especially through "the furtherance of the acceptance and sale of merchandise through advertising, publicity, or discounting." *Promotion*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/promotion (last visited Mar. 3, 2023). A reasonably intelligent person could construe the use of the words "promotional" and "prevailing" in the phrase "our Promotional Prevailing Retail Price" to indicate that Defendant's price would be discounted from, or, at the very least, not be markedly higher than, the prevailing retail price in the region. Such an interpretation would not confer "unfettered discretion", as a reasonable consumer could believe that the contracted price would be competitive with, or even below, the market price.

Because all ambiguities must be resolved in favor of Plaintiff at this stage, the Court denies Defendant's Motion as to the breach of contract claim. *See Stanley*, 466 F. Supp. 3d at 427 (holding that "[b]ased on the specific contract language at issue here, at minimum, [p]laintiff has at least raised some questions regarding [d]efendant's performance by plausibly alleging (1) that [d]efendant's contract did not include terms explicitly allowing it to have unfettered price-setting discretion, and (2) that [d]efendant's prices materially differed from metrics that could be reasonable interpretations of the use of the word "Market" to describe the "Pricing Type");

*Claridge v. N. Am. Power & Gas, LLC*, No. 15-CV-1261, 2015 WL 5155934, at *6 (S.D.N.Y. Sept. 2, 2015) (noting that the plaintiff "plausibly allege[d] that the [a]greement is confusing and ambiguous" and that whether the defendant "breached this provision cannot be resolved at the pleading stage"); *see also Beattie v. Farmanian*, No. 20-CV-3523, 2022 WL 2467644, at *3 (E.D.N.Y. May 9, 2022), *report and recommendation adopted*, No. 20-CV-3523, 2022 WL 3914987 (E.D.N.Y. Aug. 31, 2022) ("[I]n cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language.") (citing *67 Wall St. Co. v. Franklin Nat'l Bank*, 333 N.E.2d 184, 187 (N.Y. 1975)).

### 3.  Implied Covenant of Good Faith and Fair Dealing

"Under New York law, parties to an express contract are bound by an implied duty of good faith . . . ." *Arcadia Bioscis., Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 399 (S.D.N.Y. 2019) (quoting *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 159 (S.D.N.Y. 2018) ("The promise of good faith and fair dealing is treated as an implied provision in every contract . . . ." (citations and quotation marks omitted)).  The implied covenant is "breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Skillgames, LLC v. Brody*, 767 N.Y.S.2d 418, 423 (App. Div. 2003) (citation and quotation marks omitted); *see also Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008) ("The implied covenant . . . embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." (citation and quotation marks omitted)).  "In order to find a breach of the implied covenant, a party's action must directly violate an obligation

that may be presumed to have been intended by the parties." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (citation omitted).

However, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Arcadia*, 356 F. Supp. 3d at 400 (citation and quotation marks omitted); *see also Harris*, 310 F.3d at 81 ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); *JGB (Cayman) Newton, Ltd. v. Sellas Life Scis. Grp. Inc.*, No. 18-CV-3095, 2018 WL 5266877, at *13 (S.D.N.Y. Oct. 23, 2018) ("When a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." (quotation marks and alteration omitted) (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013))). Alleging that a defendant's actions "were not undertaken in good faith" also does not necessarily seek to improperly "override the express terms of [a] contract." *JJM Sunrise Auto., LLC v. Volkswagen Grp. of Am., LLC*, 997 N.Y.S.2d 270, 287–88 (Sup. Ct. 2004) (citation and quotation marks omitted). This is especially true where "the contract [may] contemplate[] the exercise of discretion," as the doctrine of good faith and fair dealing includes an additional "promise not to act arbitrarily or irrationally in exercising that discretion." *Lonner v. Simon Prop. Grp., Inc.*, 866 N.Y.S.2d 239, 245 (App. Div. 2008) (quotation marks omitted) (citing *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)).

Here, it is plausible that Plaintiff's good faith and fair dealing claim could be distinct from Plaintiff's breach of contract claims. "According to the Complaint, [Defendant] violated

the covenant by exercising [any price-setting] discretion [it may have had] in bad faith and in a manner inconsistent with [Plaintiff's] reasonable expectations." *Claridge*, 2015 WL 5155934, at *6 (citation omitted) (permitting a claim for breach of the covenant of good faith and fair dealing to survive a motion to dismiss in a similar ESCO variable-rate contract action); *see also Hamlen v. Gateway Energy Servs. Corp.*, No. 16-CV-3526, 2017 WL 892399, at *5 (S.D.N.Y. Mar. 6, 2017) (noting that the plaintiff had sufficiently "alleged [that the] defendant acted in bad faith by exercising its discretion to charge unreasonable rates to profiteer off its customers, who reasonably expected to pay [the] defendant competitive prices for natural gas" and that "the implied covenant of good faith and fair dealing requires [the] defendant to seek a profit that is commercially reasonable"). Here, Plaintiff expressly alleges that, even if contractually, "[Defendant] had unilateral discretion to set its heating oil rates," Plaintiff "and other reasonable consumers expect that notwithstanding Defendant's profit goals, its prices would be consistent with prevailing retail prices and that Defendant would refrain from price gouging." (Compl. ¶ 28.) Moreover, Plaintiff alleges that "[w]ithout these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy home heating oil from Defendant." (*Id.*)

Defendant argues that it cannot have violated an obligation that may have been presumed to have been intended by the Parties because the use of the word "our" unambiguously referred to Defendant's pricing and not "pricing in retail markets as a whole." (Def.'s Mem. 22.) Defendant contends that Plaintiff bargained for "our" price "and nothing in the Complaint indicates that he did not receive that price." (Def.'s Reply Mem. 8.) Defendant points to the decision in *Nieves*, where the court rejected a breach of covenant claim because "the fairness of the rates can be established only if the terms of the contract include that Defendant could charge only as much as its competition; the contract here, however, does not state this." 2020 WL

6803056, at *7.  However, as the Court has already made clear, the terms of the Contract here are distinguishable from those in *Nieves*, because Defendant's use of the words "promotional" and "prevailing" could indicate to consumers that the price bargained for was competitive with that of the general market.[3]

Therefore, Plaintiff alleges a distinct basis from the terms of the Contract itself for its good faith and fair dealing claim.  *See Stanley,* 466 F. Supp. 3d at 429 (holding that plaintiff alleged a distinct basis for its good faith and fair dealings claim when it pled that even if contractually, the defendant "had unilateral discretion to set the variable rate for electricity," plaintiff "reasonably expected that the variable rates for electricity would, notwithstanding [d]efendant's profit goals, reflect the wholesale and retail market prices for electricity and that [d]efendant would refrain from price gouging" and "without those reasonable expectations, [p]laintiff and other class members would not have agreed to buy electricity from [d]efendant").

Of course, it may be true that Plaintiff cannot ultimately recover on *both* the breach of contract claims *and* the breach of covenant of good faith and fair dealing.  For example, if a factfinder determines that Plaintiff's interpretation of the contract prevails and that the alleged metrics of comparison successfully show a breach of those terms, the covenant of good faith and fair dealing claim may be subsumed in the breach of contract claim.  On the other hand, it is

---

[3] Defendant also argues that even if a comparison to retail prices in the market could support a claim for breach of covenant, the claim would fail because data published by DEEP shows that during the period in question, Defendant's "pricing was within, or not materially above, the range of unspecified types of prices charged by the relevant subset of Connecticut dealers surveyed." (Def.'s Mem. 23.)   In support, Defendant attaches data from DEEP showing that Defendant's prices were within the range of DEEP's "High Weekly Price." (Mercado Decl. ¶¶ 3–5.)  Defendant argues the "High Weekly Price" is a more appropriate comparison because it excludes sales made at capped or no-frills prices. (*Id*. ¶ 4.)  At this stage of the litigation, the Court does not know what other differences exist between DEEP's "High Weekly Price" and DEEP's average prices cited to in Plaintiff's Complaint and is therefore unable to determine which standard is the more appropriate comparator.

conceivable that a factfinder might conclude that the contract itself did not promise what Plaintiff claims but that, nevertheless, Defendant violated a "duty of good faith" that it owed to less-informed consumers in providing something as universally necessary as utility services. *Arcadia*, 356 F. Supp. 3d at 399 (citation and quotation marks omitted).  But these questions are not eligible for resolution as a matter of law at the pleading stage, because "Plaintiff has sufficiently pleaded that [D]efendant plausibly charged commercially unreasonable rates, and in so doing acted in bad faith or with improper motive."  *Hamlen*, 2017 WL 892399, at *5 (citations omitted).  "Here, because the meaning of the [P]arties' contract has yet to be determined, it is too soon to address whether . . . [P]laintiff['s] claim of breach of the covenant of good faith and fair dealing is duplicative."  *E*Trade Fin. Corp. v. Deutsche Bank AG*, No. 05-CV-902, 2008 WL 2428225, at *26 (S.D.N.Y. June 13, 2008); *see also Hoover v. HSBC Mortg. Corp. (USA)*, 9 F. Supp. 3d 223, 249 (N.D.N.Y. 2014) (refusing to dismiss the good faith and fair dealing claim because the court could not "conclude as a matter of law that the . . . contracts [at issue] provide[d] the . . . [d]efendants with unfettered discretion," and the plaintiffs had properly alleged that the defendants "improperly exercised their purported discretion").  Therefore, the Court denies Defendant's Motion on this ground as well.

### 4.  Condition Precedent to Suit

Under New York law, "parties are free, within limits of public policy, to agree upon conditions precedent to suit."  *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co*., 762 F.3d 165, 188 (2d Cir. 2014) (citing *Cont'l Cas. Co. v. Stronghold Ins. Co.,* 77 F.3d 16, 19 (2d Cir. 1996)). "[C]ourts must honor contractual provisions that limit liability or damages because those provisions represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities."  *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.*, 191 N.E.3d 355, 360

(N.Y. 2022) (quotation marks and citation omitted).  "Normally, under New York law, a party's failure to comply with an express condition precedent to suit is fatal to the party's claim."  *City of N.Y. v. Tavern on the Green Int'l LLC*, 351 F. Supp. 3d 680, 692 (S.D.N.Y. 2018); *see also Command Components Corp. v. HWJ Eng'g & Surveying, PLLC*, 133 N.Y.S.3d 887, 888 (App. Div. 2020) ("A plaintiff's failure to comply with a condition precedent to suit entitles a defendant to dismissal of the action.").  However, "[c]onditions are not favored under New York law, and in the absence of unambiguous language, a condition will not be read into the agreement."  *Ginett v. Computer Task Grp., Inc.,* 962 F.2d 1085, 1099–1100 (2d Cir. 1992).

Defendant argues that the Contract language "[i]f you think your bill is wrong . . . write us on a separate sheet at the address listed on your bill as soon as possible.  We must hear from you not later than sixty (60) days after we sent you the first bill on which the error or problem appeared.  You can telephone us, but doing so will not preserve your rights" created a condition precedent to suit which Plaintiff fails to allege he satisfied.  (Compl. Ex. A at 4; Def.'s Mem. 24–25.)  Plaintiff argues there was no condition precedent to suit because the provision does not include any waiver of the right to bring a lawsuit.  (Pl.'s Mem. 24–25.)

The Contract does not plainly state that a written letter within 60 days is a prerequisite to bringing suit.  Indeed, the language "preserve your rights" is ambiguous as it is unclear which "rights" are lost if a customer telephoned rather than wrote to Defendant or what the preservation of rights entails in this context.  Conditions precedent to suit require greater clarity and specificity.  *See, e.g., ISS Facility Servs., Inc. v. Fedcap Rehab. Servs., Inc*., No. 20-CV-6591, 2021 WL 2784550, at *4 (S.D.N.Y. July 2, 2021) (holding that contract which provided that "parties may file a lawsuit only if their dispute has not been resolved through informal dispute resolution within forty-five (45) days after a party requests mediation" contained a condition

precedent to suit); *Bagley v. N.Y. Cent. Mut. Fire Insurancy Co.*, No. 13-CV-241, 2015 WL 12556146, at *5 (N.D.N.Y. June 17, 2015) (noting that the language "[y]ou may not sue us to recover money under this policy unless you have complied with all the requirements of the policy. . . . This requirement applies to any claim that you may have under this policy and to any dispute that you may have arising out of the handling of any claim under the policy" was a condition precedent to suit); *cf. IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 403 (S.D.N.Y. 2009) (holding the contract language "party claiming a breach or default shall promptly notify the other party, in writing of the claimed default or breach in as specific detail as is reasonably possible . . . and shall provide [the breaching party] with a right to cure the claimed default or breach, if curable, within thirty days of the date of notification" did not constitute a condition precedent to suit (alteration in original)).  Defendant unilaterally drafted the Contract—had it wanted to unequivocally create a condition precedent to suit, it could have done so.  Because the "preserve your rights" provision did not unambiguously create a condition precedent to suit, the Motion is denied.  *McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) ("New York follows the well-established *contra proferentem* principle which requires that equivocal contract provisions are generally to be construed against the drafter." (quotation marks omitted)).

### 5.  Leave to Amend

Plaintiff requests leave to amend his Complaint to add a cause of action under New York General Business Law § 349.  (Pls.' Mem. 15.)  This Court grants Plaintiff leave to amend, but notes that under New York General Business Law § 349, the transaction at issue must have occurred in New York.  *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002)

(holding that under New York General Business Law § 349, "the transaction in which the consumer is deceived must occur in New York").

III.  Conclusion

For the foregoing reasons, Defendant's Motion is denied.  If Plaintiff wishes to file an amended complaint, Plaintiff must do so within 30 days of the date of this Opinion & Order. Plaintiff is further advised that the amended complaint will completely replace, not supplement, the instant Complaint.  The amended complaint must therefore contain all of the claims, defendants, and factual allegations that Plaintiff wishes the Court to consider.

The Court will hold a status conference on May 9, 2023 at 2:00 PM.  The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 13).

SO ORDERED.

Dated:  March 27, 2023
        White Plains, New York

_____
        KENNETH M.  KARAS
        United States District Judge