# Exhibit A

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------x
      RYAN MELVILLE, on behalf of
 3    himself and all others similarly
      situated,
 4                   Plaintiffs,

 5        v.                                   21 CV 10406(KMK)(VR)

 6                                             TELECONFERENCE
      HOP ENERGY, LLC,
 7                   Defendant.
      ------------------------------------x
 8    MICHELLE MULLANEY and ROBERT
      MULLANEY, on behalf of themselves
 9    and all others similarly
      situated,
10                   Plaintiffs,

11        v.                                   23 CV 7318(KMK)(VR)

12    HOP ENERGY, LLC,
                     Defendant.
13    ------------------------------------x

14
                                             United States Courthouse
15                                           White Plains, New York
                                             March 6, 2024
16

17
      B e f o r e:  THE HONORABLE VICTORIA REZNIK,
18                                  United States Magistrate Judge

19

20

21

22

23

24

25        ** Transcribed from digitally recorded proceedings **

              Angela O'Donnell - Official Court Reporter
                         (914)390-4025
```

```
 1    A P P E A R A N C E S:

 2

 3              (All parties appearing via teleconference)

 4

      WITTELS MCINTURFF PALIKOVIC
 5              Attorneys for Plaintiff
                18 Half Mile Road
 6              Armonk, New York 10504
      J. BURKETT MCINTURFF
 7    ETHAN ROMAN
                -and-
 8    SHUB & JOHNS, LLC
                Attorneys for Plaintiff
 9              200 Barr Harbor Drive, Suite 400
                West Conshohocken, Pennsylvania 19428
10    SAMANTHA E. HOLBROOK

11

12    NIXON PEABODY, LLP
                Attorneys for Defendant
13              Exchange Place
                53 State Street
14              Boston, Massachusetts 02109-2835
      MATTHEW T. McLAUGHLIN
15    KEVIN SAUNDERS

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Good morning.  Will counsel please

 2   introduce themselves, starting with the plaintiff, please.

 3              MR. McINTURFF:  Good morning, your Honor.  This is

 4   Burkett McInturff and Ethan Roman from Wittels McInturff

 5   Palkovic on behalf of plaintiffs in the proposed class in

 6   Melville and Mullaney.

 7              THE COURT:  And defendant.

 8              MR. McINTURFF:  Oh, I'm sorry, your Honor, I

 9   apologize.  My colleague, Samantha Holbrook from Shub & Johns,

10   is also here.

11              MS. HOLBROOK:  Good morning, your Honor.  I

12   apologize, I was speaking to you on mute.  This is Samantha

13   Holbrook.

14              THE COURT:  Ah, that happens often.

15              MS. HOLBROOK:  Shub & Johns, also on behalf of

16   plaintiff.

17              THE COURT:  Okay, welcome.

18              And defendant.

19              MR. McLAUGHLIN:  Good morning, your Honor, it's

20   Matthew McLaughlin with Kevin Saunders on behalf of the

21   defendant.

22              THE COURT:  All right, good morning to all of you.

23              Why don't we start with a brief update on the status

24   of discovery and whether there are any issues to address.  I'm

25   holding my breath.
```

1          Mr. McInturff.

2          MR. McINTURFF:  Well, I can give your Honor an update

3   on the status of discovery.  I will say plaintiffs are not

4   pleased with the progress, I can give you an overview.  We

5   don't have any ripe disputes, but I will characterize it as

6   storm clouds on the horizon.

7          The issue is the pace of document production

8   vis-a-vis the looming April 18 discovery deadline, and the

9   background is that we agreed to search terms on January 11th

10  and the search terms that plaintiff proposed were for both the

11  Melville and Mullaney case.

12         Since January 11th, having not heard from the

13  defendant, we followed up with defendant on February 9th

14  expecting when we would receive a production.  We were promised

15  a production on February 19th.  We finally got one on March 1,

16  50 days after we agreed to search terms.  That production

17  consists of 1800 documents which, of the ones we've reviewed

18  thus far, approximately 400 are essentially pointless.  They

19  include images of Hop's logos and font files used on the

20  website.  But more concerning is the fact that the parties'

21  agreed-upon search terms covered over a million unique

22  documents.  To be precise, almost one point -- 1,100,000

23  documents.

24         So if at the pace of production -- given the pace of

25  production, first of all, there's no way, absent a directive

1     from your Honor that defendants are going to even come close to

2     substantially producing documents by April 18, and given the

3     current pace, document production wouldn't finish for several

4     years at this point.

5             The ESI protocol that we agreed to and that was

6     entered contemplates rolling productions every 21 days.  So

7     under the current schedule, that leaves only time for on two

8     more productions before the close of fact discovery.  And

9     again, we've gotten 1800 out of what's supposed to be a million

10    documents reviewed.  So in other words, defendants have

11    produced 17 hundredths of a percent of the documents that

12    they're supposed to review.

13            So we're going to have an issue unless defendant is

14    able to substantially, substantially pick up the pace of

15    document production.  We can't -- we need to wait for documents

16    to be produced before we can start noticing depositions.  So

17    the hold-up, again, I'll characterize it as dark clouds on the

18    horizon.  From our perspective, that is the major issue, but it

19    hasn't resulted in a ripe dispute yet because we just got our

20    first production on -- five days ago on March 1 and we're

21    working through that production and we should be done in the

22    next day or so.  But that's where it stands from plaintiff's

23    perspective.

24            THE COURT:  So, Mr. McInturff, looking back at the

25    letters, I understood the defendants would be producing

1    approximately 200,000 customer contracts; were those produced?

2             MR. McINTURFF:  Those were on produced, and they're

3    being analyzed.

4             THE COURT:  Okay.  And that's separate and apart from

5    the ESI that you're supposed to be getting on a rolling basis?

6             MR. McINTURFF:  Correct.  Again, we agreed to a

7    million, over a million documents on January 11th were

8    (indiscernible) by the agreed-upon on search terms.

9             THE COURT:  The understanding is the defendants would

10   be conducting a review for responsiveness and producing their

11   documents from the million hit count?

12            MR. McINTURFF:  Correct.

13            THE COURT:  So in terms of depositions, what were the

14   parties contemplating?  Were depositions going to be taking

15   place and scheduled by this April 18th deadline?

16            MR. McINTURFF:  It was our hope that we would receive

17   the document production and at least start to get them

18   scheduled, but at this point -- you know, I will say, Judge

19   Karas has put this case on a very fast track.  I can't

20   realistically say that we expected depositions to have been

21   completed by April 18 given the sheer size of discovery in the

22   case.

23            THE COURT:  Right.  I'm looking at your schedule.  So

24   you -- I guess the way he scheduled things you have expert

25   disclosures in September; is that right?  Or is that -- was

1    that going to be pending?  There's a case management conference

2    scheduled for you in May, May 31st.  Do you know what the

3    purpose of the case management schedule was going to be?

4         MR. McINTURFF:  I think it was a placeholder for --

5    that was assuming discovery had closed in April.

6         THE COURT:  Okay.  And do you have pre-motion

7    deadlines for class certification?

8         MR. McINTURFF:  We do not, your Honor.  I should say,

9    we haven't, the parties haven't spoken with Judge Karas.  We

10   didn't speak with him about the amended scheduling order.  So

11   we're only able to read what's on the docket.

12        THE COURT:  Got it.  So you have a case management

13   schedule in May, and do you also understand that you have, you

14   have expert discovery deadlines in your case management plan at

15   this point?

16        MR. McINTURFF:  That is my understanding.

17        THE COURT:  Okay.  All right.  And did you understand

18   that those expert, that expert discovery was going to be before

19   you briefed class certification or was that your intention?

20        MR. McINTURFF:  We haven't discussed that.  I mean,

21   I've seen it done both ways.

22        THE COURT:  Okay.  So let me -- how many depositions

23   do you anticipate needing here?

24        MR. McINTURFF:  Well, again, this is the issue, your

25   Honor.  We haven't -- we haven't gotten document discovery yet.

1    I think we had, and defendant can interrupt, but I think there

2    are roughly ten or 12 custodians, individual custodians.

3              THE COURT:  Okay.  Do you have categories of people

4    you wanted to depose, even if you haven't definitively

5    identified who they are?  Custodians, then so you were going to

6    pick among those, depending what you found in the documents?

7              MR. McINTURFF:  Correct.  Correct.

8              THE COURT:  Okay.  All right.  So let me turn to the

9    defendants.

10             Mr. McLaughhlin, I'm sure you have plenty to say in

11   response.

12             MR. McLAUGHLIN:  Thank you, your Honor.  So yes, it

13   is true in terms of the time frame that Mr. McInturff outlined

14   but his timeline neglects the fact that prior to the discovery

15   we produced in connection with the (indiscernible) mediation a

16   substantial amount of electronic data, namely, the bulk of our

17   sales database to plaintiff in electronic format.

18             As your Honor pointed out, the 200,000 plus contracts

19   that were produced were part of the million dollars -- or

20   million network documents.  So that's part of the one point --

21   just over a million dollar set of documents that have been

22   produced.  So it's not that we have only produced 2000

23   documents in the case or even that since we agreed on search

24   terms.  The 200,000 were produced since then.

25             Once we agreed on search terms, we did what happens

1    in every document review case; we had our vendor process those

2    search terms to be loaded onto their platform.  We're using our

3    vendor's platform, so it's in their control.  We had to

4    assemble a team to get up and running to learn the protocol to

5    start reviewing the documents.  There was the ramp-up time I

6    think exists in every case for the first few weeks, and there's

7    been a lot of nonresponsive documents in what has been

8    reviewed.  So we're producing the responses, but that's not

9    just what's being reviewed there's a lot of non-responsive

10   material that's being reviewed that's not part of it.  The pace

11   will pick up and we will be expecting to be making rolling

12   productions that are obviously larger than the initial

13   production, but I would agree with Mr. McInturff that the

14   current April 18 deadline is not -- is really not feasible

15   given the size of the document repository based on the search

16   terms.

17          THE COURT:  So based on -- so where are you now in

18   your review?  How far off are you from substantially complete

19   with reviewing the documents and being able to roll them out

20   and produce them all, realistically speaking?

21          MR. McLAUGHLIN:  I asked that question.  It's hard to

22   say.  We're going to need some time.  I mean, it's hard to say,

23   because what we've tried to do, although we'll need plaintiff

24   to sign off on this, we've asked our vendor to tee up a TAR

25   option, a technology assisted review.  That's not going to

1    reduce, which it does in some cases, the documents that are

2    reviewed, but it would likely sort of prioritize the I'll say

3    more likely to be responsive documents than the less likely.

4    Under our protocol, we need to confer with plaintiffs about

5    doing that.  That would, I think that would front-load a lot of

6    the work in terms of getting the, quote unquote, most

7    responsive documents out the door faster, but we're still

8    waiting for a final proposal from our vendor to have that

9    discussion.

10            THE COURT:  I -- yeah, go ahead.

11            MR. McLAUGHLIN:  I don't think it's a matter of

12    weeks, it's probably a matter of at least a couple of months to

13    get through this production with our team putting eyes on every

14    document, which is what we've been doing.

15            THE COURT:  So have you considered, I don't know the

16    nature of these types of documents that are being reviewed

17    manually, but have you considered, in addition to TAR,

18    producing -- I guess what's the downside of producing

19    nonresponsive documents.  Are there sensitive, commercially

20    sensitive documents in the review that you're worried about?

21    Is there a way in which you could screen for privilege, for

22    example, if that's a concern, but otherwise produce the rest

23    with clawback provisions and the like?  That obviously would

24    speed up the review.  It wouldn't be a manual review of every

25    page, but typically -- which you have a right to do, I'm not

1    suggesting you don't, but depending on the sensitivity of the

2    documents being produced, it may not be necessary.

3            MR. McLAUGHLIN:  Right.  We haven't discussed that

4    with plaintiff.  It's certainly a consideration.  I know that

5    there is, I know that there is a lot to date of really the

6    relevant material that was captured in the search terms.  I'm

7    not sure, I don't think it would be privileged, but sensitive,

8    but maybe something that we can work out through clawback or

9    other agreed-upon protocols if we go ahead.  I mean, that would

10   certainly speed up the process.

11           THE COURT:  Right.

12           MR. McLAUGHLIN:  It would actually make it less

13   expensive, too.

14           THE COURT:  You're right.  Exactly.  I've been in

15   this position before with zillions of documents needing to be

16   reviewed and clients wanting responsiveness reviews, and

17   compromises can be made to figure out, well, when you're

18   reviewing these, this is how many nonresponsive documents we're

19   getting, they're not particularly sensitive or there aren't any

20   issues there.  The downside is producing some junk to the

21   plaintiffs, but if they're willing to accept that as the

22   compromise versus the timing being much later, maybe that's

23   something you both can meet and confer and talk about.

24           Relatedly, maybe there's a way to -- as you're

25   reviewing, you're seeing -- maybe there are certain search

1    terms that are likely to be giving you these nonresponsive

2    hits.  So maybe there's a way you can take this million plus

3    set of documents that hit the search terms, do an analysis that

4    tells you which ones are garnering which of these search terms

5    seem to be garnering junk and maybe have a agreement to sort of

6    filter those out, and maybe that would reduce the universe that

7    you would have to review in the first instance.

8            I mean, there are a lot of different technological

9    ways you're probably thinking about this.  I'm not giving you

10   new ideas, probably.  I'm just suggesting there might be a way

11   to tackle this mountain of documents in a more efficient way if

12   what you're finding is that you're being slowed down by a lot

13   of nonresponsive hits.

14           MR. McLAUGHLIN:  I agree with everything your Honor

15   just said.

16           THE COURT:  Okay, so is that -- I mean, if you're not

17   adverse to that, would there be a value in some meet and confer

18   between the parties to sort of think that through and maybe

19   come up with a more efficient way to get through the bulk of

20   what's remaining?  It sounds like it would be, and it would be

21   in your interest to do that, Mr. McLaughhlin, because I think

22   it would be cheaper for your client also.

23           MR. McLAUGHLIN:  We're certainly amenable to that.

24           THE COURT:  Okay.  And I also hear you, both sides,

25   that you have an aggressive schedule, and given the size and

1   magnitude of the documents and the document review and

2   potentially the number of witnesses that need to be deposed, I

3   really don't know how an April 18th deadline would work.

4   That's just my take.

5          So if the parties aren't wedded to that April 18th

6   deadline, it sounds like it would make sense to negotiate a

7   more realistic deadline for the parties to be able to get the

8   documents produced.  To me it sounds like what would make sense

9   is to negotiate a deadline for substantial completion of these

10  documents after meeting and conferring about a more managable

11  way to produce them and in as fast and efficient way as

12  possible then have sometime after that substantial completion

13  deadline for these fact depositions that you want to take so

14  you have room built into your schedule to be able to review the

15  documents and then notice depositions.

16         Do the parties agree that that's a reasonable way to

17  want to proceed, Mr. McInturff?

18         MR. McINTURFF:  Yes, your Honor.

19         THE COURT:  Mr. McLaughlin?

20         MR. McLAUGHLIN:  Yes.

21         THE COURT:  So I think the issue is, I guess what I

22  don't know is what your -- you have a case management

23  conference with Judge Karas, that's true, May 21st, but your

24  ultimate discovery deadline, as I understand it, is now

25  September 18; is that correct?

1          MR. McINTURFF:  Well, your Honor, that's for expert

2     disclosures.  In my reading of the scheduling order would be if

3     we were going to move, if we wanted to have fact discovery

4     post-April 18th we would need to raise that issue promptly with

5     Judge Karas.

6          THE COURT:  With Judge Karas?  Okay.  Because

7     usually -- so the way it usually works with Judge Karas --

8     maybe that's what he told you.  The way I usually read his

9     scheduling order is that I have the power to move your interim

10    deadlines, which typically includes the fact discovery

11    deadline, but not the ultimate discovery deadline, which

12    usually is the final date that all expert discovery should be

13    completed.  If I'm reading that -- if I'm correct about that,

14    then your ultimate discovery deadline, in my mind, would be in

15    September and there would be room for us to move the fact

16    discovery deadline accordingly.  Of course, if it affects and

17    impacts your ultimate discovery deadline, meaning it doesn't

18    give you enough time to then proceed with your expert

19    discovery, that's obviously an issue for the parties to deal

20    with, and that would mean it would make sense to address the

21    request to Judge Karas.

22          MR. McINTURFF:  Your Honor, we are fine with your

23    Honor's reading of Judge Karas' order if that's how the Court

24    would like to manage fact discovery in this case.  I just, as

25    I'm sure your Honor can appreciate, I don't want to be in a

1   position of having blown any deadlines.  If your Honor reads

2   the order that way, which I think is a reasonable reading of

3   Judge Karas' order, we're happy to proceed in that fashion.

4           THE COURT:  Okay, well, I can --

5           MR. McLAUGHLIN:  Your Honor, I read Judge Karas -- I

6   read the notation, I wasn't in the case at the time, but that

7   interim deadlines could be extended through your Honor, as

8   well.

9           THE COURT:  Right, okay.  I can confer with Judge

10  Karas to make sure I'm on the same page with him.  But that's

11  my understanding.  So if that's the case, how much time do the

12  parties think they would need to build into the schedule before

13  September 18 for expert discovery?

14          How much wiggle room do we have here with pushing out

15  fact discovery?

16          MR. McLAUGHLIN:  Can I ask, your Honor, does expert

17  disclosure, I mean, is that -- is that, to your Honor's

18  reading, when expert discovery has to be completed or

19  disclosures and there's a period for deposition after

20  disclosure?

21          THE COURT:  I have to look at, for whatever reason I

22  don't have -- because it looks like that extension, was that

23  done by memo endorsement to September 18th?

24          MR. McINTURFF:  Correct.

25          THE COURT:  Okay, so I have to look back at that to

1    see what that was.  Typically with Judge Karas' expert schedule

2    he puts in a date for the expert of plaintiff and then another

3    date for expert of defendant, and that final date is the date

4    that he expects all expert discovery to be done, including

5    depositions.  So it's a little bit misleading when you read it,

6    because one could think, and some parties have been mixed up by

7    this, but you might think that means when you disclose your

8    expert report, but that's not what it means, even though it

9    seems that way.  Instead, he expects everything is done by that

10   final date.  So what I typically tell parties with Judge Karas'

11   schedule is to look at that final deadline of expert discovery

12   and then work backwards and figure out when that means the

13   parties should exchange their reports and disclosures so they

14   build in enough time for depositions to meet the ultimate

15   deadline.

16            MR. McINTURFF:  If I could, your Honor, the current

17   schedule your Honor's referencing I think the Court has in

18   front of it is ECF 82, but the earlier schedule, as the Court

19   said, with the way Judge Karas does it, that's ECF 43.

20            THE COURT:  Right.

21            MR. McINTURFF:  And I'm reading, what I'm reading is

22   our expert -- ECF 82 where we saw an extension of the June 18,

23   2024, expert disclosure deadline, which is what corresponds

24   with what's in ECF 43, was pushed out to September 18.

25            So to go back and answer your Honor's question about

1    can we squeeze expert discovery in between -- can we squeeze in

2    expert discovery before September 18, 2024, unless defendant,

3    unless production is completed very, very soon, I don't think

4    that is realistic.  In my practice, typically the expert report

5    and you know deposition process typically takes two to three

6    months.

7            THE COURT:  Okay.  So you would want two to three

8    months including reports or a month for -- let's say you have

9    opening reports, a month later for rebuttal, and a month for

10   depositions?

11           MR. McINTURFF:  That's the schedule I've seen most

12   common, I've also seen slightly shorter, but that's the one

13   I've seen most; a month for plaintiff, a month for defendant,

14   and then a month for depositions.

15           In my practice, that typically all occurs after the

16   close of fact discovery.

17           THE COURT:  Right.  So that would mean reports,

18   opening reports in July to meet your September 18 deadline.

19           MR. McINTURFF:  Correct.

20           THE COURT:  How much time do you expect,

21   Mr. McInturff, after getting the substantial completion of

22   documents that you would want to build in for noticing and

23   taking all the depositions, the fact depositions?

24           MR. McINTURFF:  You know, I'm pleased, don't hold me

25   to this in terms of what I can expect.  Again, we haven't

1    received the document discovery, but I think two to three

2    months of depositions, assuming we're taking ten, somewhere in

3    the area of ten to 12 depositions, I think two to three months

4    is an aggressive but realistic schedule.

5             THE COURT:  Okay, Mr. McLaughlin, what are your views

6    about that?  Do you essentially agree with that general

7    roadmap?

8             MR. McLAUGHLIN:  Yes, certainly on the expert aspect,

9    I think that's consistent with what I would expect, and being

10   realistic, I think the two-to-three month deposition schedule

11   is probably what it's going to take here.

12            THE COURT:  Right.  So that essentially, from my

13   calculations would mean about six months the parties would want

14   to build into their schedule after substantial completion of

15   documents.  Is that fair to say on average, Mr. McInturff?

16            MR. McLAUGHLIN:  I think that's fair, your Honor.

17            THE COURT:  Do you agree generally with that,

18   Mr. McLaughlin?

19            MR. McLAUGHLIN:  I do.

20            THE COURT:  The one question mark, though, is how

21   soon Mr. McLaughlin can produce the bulk of these documents

22   from the ESI protocol.  As of now, it's March 6, what I'm

23   hearing from you at least, if things go as planned, it could

24   take another two months for you to be substantially complete,

25   if you were to do it the way you're doing it now; is that fair

1    to say?

2             MR. McLAUGHLIN:  I would say that's fair to say.  It

3    could be longer, but I think it absolutely makes sense for us

4    to proceed with what your Honor laid out, which is confer with

5    plaintiff's counsel about a way to streamline this so that

6    we're not doing a manual review.

7             THE COURT:  Right.

8             MR. McLAUGHLIN:  That's the right answer here.

9             THE COURT:  Okay, so, Mr. McInturff, what are your

10   thoughts about what we've said in finding ways to attack the

11   volume of documents so that you get things sooner?  Do you have

12   any thoughts about that?

13            MR. McINTURFF:  Well, what is not clear to plaintiff

14   is how many of the million have been reviewed to date.

15            THE COURT:  Right.  I guess I asked that generally

16   but I don't know where --

17            MR. McINTURFF:  What's the progress?

18            THE COURT:  Does that matter too much?  Why does that

19   matter too much?  We can ask Mr. McLaughlin, he can figure that

20   out?  But given his sense of what's taking so long, do you

21   generally agree that there are ways that you could maybe more

22   efficiently get the documents produced to you?

23            If you met and conferred any agreed, they agreed to

24   produce things that may be nonresponsive in the first instance

25   they haven't weeded out because they hit upon the search terms

                Angela O'Donnell - Official Court Reporter
                          (914)390-4025

```
 1   and/or you agree to -- or you agree to modify the terms to weed

 2   out what seems to be nonresponsive.

 3            MR. McINTURFF:  Your Honor, I do generally agree.  If

 4   three, 400,000 documents have already been reviewed, I think

 5   that changes our view as to how quickly -- I should say --

 6            (Teleconference disconnected)

 7            (Teleconference resumed)

 8            THE COURT:  Hi all.  I hope you're all back.  I'm

 9   sorry that we all got kicked off.

10            Mr. McInturff, are you still there?  Mr. McLaughhlin?

11            MR. McINTURFF:  Yes.

12            MR. McLAUGHLIN:  Yes.

13            THE COURT:  Sorry.  Okay, so what we were -- I think

14   Mr. McInturff was in the middle of explaining that he wanted to

15   know how many of the one plus million documents have been

16   reviewed, because that might influence his view about the type

17   of agreement you might be able to reach with further review.

18            Is that fair, Mr. McInturff?

19            MR. McINTURFF:  And we did not appreciate that

20   defendant was counting among the million the 200,000 contracts

21   being produced, so that leaves roughly 800,000.

22            My question is of the 800,000 how many are left to

23   review?

24            THE COURT:  Okay.

25            So is that something you have the answer to,
```

1    Mr. McLaughlin, today or can get the answer to?

2            MR. McLAUGHLIN:  I don't have it, obviously, yes, I

3    can get it.  I don't have it now.  I'll tell you, I would be

4    shocked if we're approaching the halfway mark.  I don't think

5    we are.  So it's not like, in terms of efficiency that we're

6    almost there anyways, so it makes sense.  But I can get the

7    details.

8            THE COURT:  Okay.  Well, so I guess to me what I was

9    saying is that that's the big if, sort of the timing of when

10   the substantial completion of this document production will be

11   done, because that's sort of the gating measure for the rest of

12   your schedule and it sounds like your schedule is one that

13   you'd have to extend with Judge Karas' permission if what I'm

14   hearing is, if we built in say a month or two months for

15   getting all the documents produced.  So let's assume we got

16   that to the end of April or mid-May.

17           Don't have a heart attack, Mr. McInturff, I'm just

18   throwing out ideas.  Let say if we got it to -- that was the

19   date that all the documents were produced, it sounds like the

20   parties need or agree that about six months after that your

21   schedule would be laid out, two the three months of fact

22   depositions after that date, and then another three months for

23   your expert discovery, right?  October.  So that puts you a

24   couple months past the current deadline that you have in your

25   case management plan.

1          So that, indeed, would have to be handle by Judge

2     Karas.  That's not something I could move for you.

3          So I guess my suggestion is, before we get too far

4     ahead of ourselves, for the parties to have a meaningful

5     conversation about how to attack the remaining document review

6     and whether there's an efficient way to get the bulk of that

7     produced sooner rather than later.  And I guess if it's

8     possible to somehow whittle that down to a manageable number

9     without a full-blown responsiveness review, then it may be that

10    you guys can decide upon a deadline of substantially completing

11    those documents.  That would be just a month or two from now.

12    But I don't know.  I guess that's the question mark.

13          Does that sound out of the question, Mr. McLaughlin?

14          MR. McLAUGHLIN:  No, I think that all makes sense.

15          THE COURT:  Okay.  So what I would suggest is the

16    parties first meet and confer, talk over the document issue to

17    see if you can agree upon what a substantial completion

18    deadline might look like, and then we can work backwards from

19    there to see what type of schedule you can agree upon and then

20    it would probably be going to Judge Karas to get him to sign

21    off on it.

22          Does anyone have any objection to that order of

23    operations?

24          Mr. McLaughlin, I'll ask you first.

25          MR. McLAUGHLIN:  No objection, your Honor.

```
 1              THE COURT:  Okay.

 2              Mr. McInturff, what about you?

 3              MR. McINTURFF:  No, your Honor.

 4              THE COURT:  Did the parties have a suggestion for how

 5    long you want to meet and confer?

 6              To keep things moving, I'd like the parties to update

 7    me on the status of those discussions and whether you've

 8    reached an agreement.  Is there -- how long do you think you'll

 9    need to have a meaningful discussion about that and get back to

10    the Court?

11              Mr. McInturff, do you want to suggest a deadline?

12              MR. McINTURFF:  Well, from plaintiff's perspective, I

13    think most of the -- defendant has most the information.

14              THE COURT:  It's a fair point.  So Mr. McLaughlin,

15    that's really a question for you then.

16              MR. McLAUGHLIN:  Sure, and since I'm not the one

17    doing the review, I can throw their whole team under the bus.

18    I would say a week.  Can we have by the end of next week?  If

19    we hopefully have an opportunity to confer and then report to

20    the Court on the status even if we haven't hammered out

21    something.

22              THE COURT:  All right, why don't we do that.

23              So by March 15th the parties should submit a joint

24    status letter with an update on the status of these discussions

25    about producing documents and its repercussions for the
```

1    remaining discovery schedule.  And, then, once I receive that,

2    if you have recommendations of how you want to proceed, you can

3    put that in the letter, otherwise I'll just decide whether we

4    need to meet again or direct you accordingly.

5            Let me ask in the Mullaney case has there been a case

6    management plan ordered in that case?  Is it coordinated with

7    the Melville case?

8            MR. McINTURFF:  Your Honor, I mean, I think that

9    raises an issue that has come up in our class counsel briefing.

10   It's plaintiff's view that we should consolidate the cases and

11   we provided briefing that there is the authority that the Court

12   can *sua sponte* consolidate the cases.  So we think that that

13   would be the best way to handle coordination.  Also, I think

14   that would help explain to Judge Karas why we needed additional

15   time.  So I think there's a benefit in consolidation in that

16   regard because fundamentally the cases are not different.

17   That's our proposal on how to coordinate.  And I will say our

18   search terms are the same.  We aren't expecting any different

19   substantive discovery.

20           THE COURT:  So have you -- maybe I'm forgetting, but

21   did you raise this consolidation issue with Judge Karas or you

22   raised it as part of your briefing with me on the interim class

23   counsel motion?

24           MR. McINTURFF:  Well, we raised it with defendant and

25   then we re-raised it in our briefing within our class counsel.

1          THE COURT:  I see, but it's not something you've

2    addressed with Judge Karas directly.

3          MR. McINTURFF:  Correct.

4          THE COURT:  Okay.  And as of now, is there a CMP in

5    Mullaney that Judge Karas entered or no?

6          MR. McINTURFF:  I don't think so.  Let me check

7    briefly, but I do not think so.

8          MR. McLAUGHLIN:  No, there hasn't been.

9          THE COURT:  Okay.  And have the parties met and

10   conferred to try to propose one or is that just wrapped up in

11   this discussion about whether or not to consolidate?

12         MR. McLAUGHLIN:  We have not --

13         MR. McINTURFF:  Go ahead, Matt.

14         MR. McLAUGHLIN:  Sorry.  We have not conferred on a

15   case schedule.  I would agree with Mr. McInturff we have

16   treated discovery in Melville as covering Mullaney, that was

17   both before the search terms and in connection with the ads,

18   the database data we produced.  So we have been producing

19   documents in Melville that would be responsive that we

20   understood plaintiff would be seeking in Mullaney as well.  We

21   have not.  There's been no schedule entered in Mullaney.

22         THE COURT:  Okay, and have you purposely not

23   responded to plaintiff's request to consolidate these cases or

24   is that something you're pondering or do you have a view one

25   way or the other?

1          MR. McLAUGHLIN:  There was a request months ago on

2    our thoughts on it and we said we could consider it and then

3    we -- the short answer is we have not taken a position.  I'm

4    not sure we need -- there's no motion to consolidate that's

5    being filed, to consolidate that's been filed.

6          I think at a minimum we agree discovery should be

7    coordinated, and that can happen without formal consolidation

8    of the two matters, and I think that has been happening.

9          THE COURT:  I see, okay.  So at the very least,

10   Mr. McInturff, you agree that discovery should be coordinated.

11         MR. McINTURFF:  Yes, your Honor.

12         THE COURT:  And up until now by default it has been

13   even though there's no specific agreement to do that?

14         MR. McINTURFF:  Correct.

15         THE COURT:  And so I guess at this point maybe

16   we'll -- and when you're -- are there going to be, in your

17   mind, Mr. McInturff, separate discussions about ESI protocols

18   and the like to cover Mullaney or do you believe the

19   negotiations you've already undergone and the documents you'll

20   be getting in Melville will cover what you need in Mullaney?

21         MR. McINTURFF:  I think the latter is the case, your

22   Honor.  It's plaintiff's view that consolidation, it makes the

23   most sense from an efficiency standpoint.  For example, if we

24   didn't consolidate, we would, at least theoretically, need to

25   have the Court take the time to endorse the identical ESI

1    protocol that exists in Mullaney -- that exists in Melville for

2    Mullaney.  We don't think that's a smart use of anyone's

3    resources.

4            THE COURT:  Right, well, putting that aside, I want

5    to make sure I understand, what you're saying is you think

6    you're saying the discovery you're getting in Melville is

7    coextensive with what you want in Mullaney and you won't be

8    needing to negotiate separate search terms.

9            MR. McINTURFF:  Correct.

10           THE COURT:  Okay.

11           MR. McINTURFF:  And we negotiated search terms with

12   an eye to this, you know, the overlap in the cases already.

13           THE COURT:  Understood.  Okay.  Well, I'm going to

14   hold off on the question of consolidation at the moment and a

15   case management plan because I think there are a lot of

16   question marks with the case management plan in Melville to

17   begin with, how a lot of question marks with the case

18   management plan in Melville to begin with, which will also

19   cover Mullaney, even if all we're doing is agreeing that the

20   discovery is coordinated.  So let's see if we can get Melville

21   in order and then we can sort out Mullaney since it's moving

22   ahead, as I understand it, just by virtue of us pushing

23   Melville along.

24           Is that correct, Mr. McInturff?

25           MR. McINTURFF:  That is correct, your Honor.

1          THE COURT:  Okay, so let's proceed with the parties

2     sending me a joint status letter by March 15th and we'll see

3     where things stand from there.

4          The Court is reviewing, now that the interim class

5     counsel motion is fully briefed, the Court is reviewing that.

6     We'll issue an opinion on that soon as well.  Just so you know

7     I haven't forgotten.

8          MR. McINTURFF:  Thank you, your Honor.

9          THE COURT:  Are there other issues to be addressed

10    today?

11         Mr. McInturff.

12         MR. McINTURFF:  No, your Honor, and we appreciate the

13    Court's attention to case.

14         THE COURT:  Mr. McLaughlin.

15         MR. McLAUGHLIN:  Nothing from me, your Honor.  Thank

16    you.

17         THE COURT:  Okay, great.  Then, I will look forward

18    to hearing from the parties on March 15th.

19         This conference is adjourned.  Thank you very much.

20         MR. McINTURFF:  Thank you.

21         MR. McLAUGHLIN:  Thank you.

22                          o0o

23

24

25