Exhibit A

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ----------------------------------x

3   RYAN MELVILLE, on behalf of
    himself and all others similarly
4   situated,

5                    Plaintiffs,

6        -against-                        21 CV 10406(KMK)(VR)
                                          Conference
7

8   HOP ENERGY LLC,

9                    Defendant.

10  ----------------------------------x

11                                   United States Courthouse
12                                   White Plains, New York
                                     October 31, 2023
13

14
    B e f o r e:  THE HONORABLE VICTORIA REZNIK,
15                                 United States Magistrate Judge

16

17

18  SHUP & JOHNS LLC
             Attorneys for Plaintiffs
19  JONATHAN SHUB

20

    WITTELS McINTURFF PALIKOVIC
21           Attorneys for Plaintiffs
    J. BURKETT McINTURFF
22
    NIXON PEABODY LLP
23           Attorneys for Defendant
    MATTHEW T. McLAUGHLIN
24  KEVIN SAUNDERS

25           ** Transcribed from recorded proceedings **

              Angela O'Donnell - Official Court Reporter
                        (914)390-4025

1              THE COURT:  Good morning.  This is the Melville case.

2              Will counsel please introduce themselves, starting

3    with the plaintiff.

4              MR. SHUB:  Good morning, your Honor.  Jonathan Shub,

5    Shub & Johns, for plaintiffs.

6              MR. McINTURFF:  Good morning, your Honor.  This is

7    Burkett McInturff from Wittels McInturff Palikovic for the

8    plaintiffs and the proposed class.

9              MR. McLAUGHLIN:  Good morning, your Honor.  This is

10   Matt McLaughlin and I'm with Kevin Saunders from Nixon Peabody

11   LLP for the defendant.

12             MR. SAUNDERS:  Good morning, your Honor.

13             THE COURT:  Good morning everyone.

14             So we are here to discuss the various disputes that

15   the parties have brought to my attention and I'm hoping that we

16   can work through them methodically to see if we can reach a

17   resolution and you all can move forward with the case.

18             So I guess I'll start with Mr. McInturff and

19   Mr. Shub.  Can you describe for me what exactly you think you

20   really need from the defendants and what you think they haven't

21   provided.

22             MR. McINTURFF:  Thank you, your Honor.  This is

23   Burkett McInturff.  I'll give the first crack.

24             So starting with ECF 75, the main issue is picking up

25   on the order that your Honor issued at the July 18 conference

1    over three months ago regarding defendant's identification of

2    the contracts that applied to its customers over the various

3    geographies and the various time period.  We expected when we

4    started -- if your Honor will recall, this issue came up on a

5    motion to compel because the prior defense counsel was

6    objecting to the class definition as being overly vague, and it

7    came out in that conference on July 18 that, in fact, what

8    defense counsel, then defense counsel's true concern was that

9    they were not able to locate the contracts that applied to

10   Hop's customers across the various geography and over time.

11   And so your Honor ordered the parties to begin a conferral

12   process to try to figure out how to identify the applicable

13   contracts.

14          Shortly after, about ten days after your Honor's

15   order, Hop relieved its prior counsel, and shortly thereafter

16   current counsel at Nixon Peabody appeared.  It's now been over

17   three months and we've been working to try to identify the

18   contracts.

19          At this point, there hasn't been, from plaintiffs'

20   perspective, there hasn't been material progress and the path

21   we're headed down, from what defendant is proposing, is not

22   going to actually get us a sufficient answer.  The path -- to

23   best understand our proposal is to understand what the

24   methodological flaw in the defendant's proposal is, which is

25   the defendant had uploaded some 200,000 separate contracts.  If

1    I could provide a little more background.  The defendant claims
2    to have the contract that applies to each customer saved in a
3    database, but they don't have any sort of record as to which
4    contracts were applied over time.

5         In fact, my understanding from discovery is that they
6    don't even have -- they don't even have a record of which
7    contracts actually exist.  So they can't, for example, say --
8    they can't produce to us, for example, say the contract that
9    applied to this region of New York in 2019.  They can't point
10   to it.  They don't have it.

11        So instead, defense counsel is saying of these
12   200,000 or so contracts that they've got in their database --
13   and I should say, our understanding is is that each customer in
14   the defendant's database, each customer has a contract
15   associated with their account.  So we're talking about 200,000
16   accounts.  They've uploaded all of these contracts to their
17   eDiscovery provider and they're now starting to run search
18   terms to try to identify any differences across them.

19        The reason that is methodologically inadequate for
20   our purposes is we're not going to get admissible testimony
21   from that process that is going to tell us for any given
22   customer at any given time period here's what the relevant
23   pricing term is in the contract.  And if your Honor will
24   recall, the reason the pricing term is so critical is that's
25   what this case is about.  The defendant promised to price its

1    heating oil in a certain way and the plaintiffs allege that

2    they breached that pricing promise.

3           Now, there's a dispute about what that pricing term

4    means and the defendants have taken the position that the

5    pricing term actually gave them quite a bit of discretion in

6    how they would calculate and charge them rates.  So plaintiffs

7    also pled, in addition to our breach of contract claim, pled an

8    alternative claim for a breach of the duty of good faith and

9    fair dealing which Judge Karas also sustained, so he sustained

10   the breach of contract claim saying he construed the contract

11   as basing Hop's heating oil prices on Hop's wholesale cost of

12   heating oil.  And then he said, in the alternative, if Hop is

13   right, plaintiff has still pled a claim for breach of the duty

14   of good faith and fair dealing insofar as Hop may not have set

15   their prices in -- Hop may not have used its discretion in good

16   faith.

17          So one way or the other, we need to know the pricing

18   term for every proposed class member.  And defendant's proposed

19   analysis of these 200,000 or so contracts really is, in our

20   view, is going to prepare the defendant to do one of two things

21   that will be admissible and useful in this case.  Either the

22   parties can stipulate to what the pricing term is across the

23   various geographies or the defendant can prepare a 30(b)(6)

24   witness, and we can take testimony on the pricing term.

25   Because, fundamentally, this is a recordkeeping issue with

1  defendants and the way the defendants ran their business.  You

2  know, it's black letter law that consumers and employees and

3  other third parties don't have to suffer from the recordkeeping

4  inadequacies of defendant and that we're entitled to an

5  efficient production of information.

6        So we think that the best way to move forward, given

7  that it's now been three months, is that either that defense

8  counsel wrap up its analysis and either they prepare a witness

9  for a 30(b)(6) deposition so that we can take testimony,

10  binding testimony, as to which pricing terms applied to which

11  customers over which geographies or the parties can get to work

12  on a stipulation based on the information that defense counsel

13  has, and then we can button this issue up and move on.

14        Because, you know, we've done cases like this in many

15  different jurisdictions against many different energy

16  companies, and I can tell you, we've never had an energy

17  company that couldn't tell us what the operable contract was

18  across the geography, and we spent many months working on this,

19  and we need to bring it to a head and put it behind us.

20        So that's the thrust of the first letter motion or of

21  the joint letter that's at ECF 75.

22        THE COURT:  Let me ask you a followup question about

23  that.

24        MR. McINTURFF:  Sure.

25        THE COURT:  So why -- looking at the sample contracts

1    that were provided to me, they do provide the pricing term,

2    from what I can tell.  So what is it that you wouldn't be

3    getting from defendants?  If they were to produce to you the

4    contracts based on search terms that they have within this

5    database, what is it that you wouldn't be getting if you got

6    those contracts?

7          MR. McINTURFF:  What we wouldn't be getting is the

8    ability to identify across the proposed class which contract

9    applies.  So that's why we either need -- we either -- at this

10   juncture, we either need a 30(b)(6) or a stipulation.  Because,

11   again, what we're accustomed to seeing is the defendant can

12   say, okay, here's the contract for Connecticut.  We amended it

13   twice.  We amended it in 2019, then we amended it in 2022.

14   Here's the contract and here are the amendments.

15          Here's the contract for New York.  It was never

16   amended.

17          So then we know which customers were subject to which

18   pricing term.  Because when we go to the class action trial,

19   what we're going to argue is, you know, this group of customers

20   was subject to this pricing term and we're going to put

21   questions to the jury like, if the contract promises the

22   promotional prevailing retail price for first-year customers,

23   for example, then it's going to be a question of fact as to

24   what that price would be.  But we can't -- until we get our

25   arms around the scope of who's covered by these contracts --

1    and again, there's no question that that defendant -- the

2    defendant has the various contracts, they just don't have a

3    way -- their recordkeeping issue is that they don't have any

4    way to identify which contracts apply to which customers in an

5    aggregate setting.

6          So what we're missing is that aggregated discoverable

7    and admissible information that, at this point, we only think

8    we can get through a 30(b)(6) or a stipulation.

9          THE COURT:  Okay.  So but if you got, which I

10   understand, but if you were to get all of the information that

11   we're talking about, does it derive from -- would you be able

12   to get that information if you had the underlying contracts

13   themselves?  Meaning, let's say they gave you all 200,000

14   contracts.  I'm not saying that's what you should get, but

15   let's say you got all the contracts.  Then presumably you would

16   be able to sort -- it would be a big task perhaps -- but you'd

17   be able to sort them by geographical region, by time period,

18   and then I guess you'd have to do -- you'd see chronologically

19   how they'd change.  So it would be this manual process of

20   figuring out which contracts applied to which customers at a

21   particular point in time, and you're saying that the work of

22   doing that is not something that you should have to do but that

23   defendant should have to do.

24          Is that fair?

25          MR. McINTURFF:  Yes, I think that's fair.  I think to

1    put an additional point on it is that defendants can't operate

2    their business without understanding what contracts apply to

3    which customers.  They're serving customers ostensibly under

4    various contracts.

5            So the fact that they can't produce this is not --

6    it's not fair for us to have to sift through this and do what

7    can be done in either testimony or a stipulation.

8            THE COURT:  But am I correct, though, that the

9    information that you're seeking could be derived from analysis

10   of all the contracts that they have?

11           MR. McINTURFF:  Assuming there's adequate metadata,

12   which I'm not so sure there is because we asked, we suggested

13   that metadata be used to identify the contracts.  But assuming

14   there's adequate metadata associated with each customer

15   account, it is theoretically possible to perform that analysis,

16   that's correct.

17           THE COURT:  And when you're requesting a 30(b)(6),

18   what you're looking for is testimony that would say what their

19   policy or practice is as to pricing the contract that's

20   applicable, and which pricing term applied and in this

21   geographic region during this period of time.

22           MR. McINTURFF:  Correct.

23           THE COURT:  You're hoping a witness would be able to

24   be prepared to say what their policy and practice was with

25   respect to that.

1          So have you asked defendants for documents, I am

2    assuming you have, about what their policies or practices were

3    for the contracts that they've used and the pricing terms for

4    particular geographic regions and have you received that.

5          MR. McINTURFF:  Correct.  I mean, that was the

6    genesis of our, that's been the genesis of our repeated

7    requests after the July 18 conference.

8          Again, July 18 we found out from prior defense

9    counsel that they were having trouble identifying which

10   contracts applied and then your Honor ordered us to look

11   further into it.

12         THE COURT:  Were there any contracts that were

13   produced?

14         MR. McINTURFF:  Yes, there were.

15         Again, there's been a smattering of contracts

16   produced.  It's not the issue of being -- the issue is not

17   being able -- we can all determine the relevant pricing term

18   from a produced contract.  The issue is which contracts applied

19   to which customers over which time period.

20         THE COURT:  When you say which customers, you mean in

21   the aggregate like certain geographic regions.  Because

22   obviously the contract itself tells you the name of the

23   specific customer and where they're located.

24         MR. McINTURFF:  That's correct.

25         THE COURT:  Okay.  So let me ask -- I wanted to sort

1    of take this in bites to see if we could move through the

2    issues.  So that's sort of the first issue.

3              Mr. McLaughlin, can you explain to me your position?

4    I understand you have all of these contracts.  Is it correct

5    that there isn't a policy or practice within Hop Energy that

6    allows you to be able to identify the type of contracts that

7    applied to particular regions during particular periods of

8    time?

9              MR. McLAUGHLIN:  That's correct, your Honor.

10             The company did not preserve, as a practice, the form

11   contract in any given period of time.  They keep -- and they do

12   that because they don't want their various branches which

13   operate under different names to have access to old form

14   contracts and use the wrong contract.  So they keep their

15   current form contract for the different types of plans that are

16   available.  Those have been produced.

17             They keep every historical actual contract with the

18   customers.  We have all of those.  But there's not a meaningful

19   way for us to say in any particular region, in any particular

20   year, what -- what did the contract look like in 2017 in every

21   region.  The general policy was that when the contract was --

22   when there was a change to the contract, it was applied

23   company-wide and it was adopted in every branch.  But the

24   challenge, and what we have -- we have produced samples of

25   contracts to the plaintiffs.  We can't be sure that there was

1    not other changes.  And from the samples that we presented to

2    your Honor, there are some, I would say, nonsubstantive changes

3    to various contracts.

4          But the terms that are at issue in this case are the

5    same, but there are formatting differences.  There are font

6    differences.  There are some other, I'd say, nonmaterial

7    provisions that appear in one and not in the other.  But

8    there's not a way for us to meaningfully say with any

9    confidence what a particular contract in a particular geography

10   looked like at a particular point in time without just pulling

11   some contracts in that range and looking at them.  And that's

12   what we've proposed to do here.

13         We can run search terms.  For example, in the other

14   class action that we're defending in Pennsylvania, that

15   actually applies to all types of contracts that we provide.

16   We've done that exact exercise.  We have pulled for every year

17   for every branch the sample form contracts.  So you can see

18   over time what changes were made.

19         But there's not a way for us to say for certain

20   whether any change was made to any specific branch contract at

21   any period of time.  I don't think a 30(b)(6) deposition is

22   going to give us an answer because there's nobody at the

23   company -- if we had that answer, we'd be able to tell them.

24   It would require us to go through that same exercise of pulling

25   and analyzing all 200,000 contracts and seeing if there's any

1   differences.

2         And I don't think that's proportional for the claims

3   in this case.  The claims in this case, the proposed class are

4   the customers who have agreements that are tied to first year

5   customers' promotional rates.  The only -- from our internal

6   searches of the 200,000 contracts, the only customers that

7   have, that we have discovered that have that language, are

8   Connecticut based customers and only for a period of four or

9   five years, 2016 to 2020 or so.  We haven't found a single

10  contract outside of Connecticut that uses -- that used that

11  unique language that was alleged in the complaint.

12        And so we don't think it's necessary.  We are happy

13  to provide -- and I think what was contemplated the last

14  hearing, I wasn't there when I read the transcript, what your

15  Honor said was run search terms.  We can run search terms to

16  try to identify differences in contracts.  We've offered to do

17  that.  We've invited search terms, but from the exemplars that

18  you've seen, there's not going to be meaningful differences

19  across the years for the terms that are at issue in these

20  contracts.  And so we think that a sampling is the most

21  appropriate way to get the plaintiffs what they're looking for

22  here.

23        This notion that we have -- we just don't have a

24  formulaic way of -- and I don't think we have any obligation.

25  The fact that the plaintiffs view that as odd that the company

1    didn't preserve their form contracts over a historical period

2    of time, that was just not their business practice, but they

3    have the actual contracts.

4             THE COURT:  So Mr. McInturff, if defendants were to

5    produce -- why are the search terms inadequate?  Why is it --

6    going back to what we initially talked about, running search

7    terms to identify the relevant contracts during the relevant

8    time period -- why would that not get you what you want?

9             MR. McINTURFF:  Yes, your Honor.

10            The reason why just running search terms is

11   inadequate is because that's not going to tell us what

12   contracts apply during which time.  We would get -- essentially

13   we would get some sort of sample of the contracts.

14            We're amenable to a reliable sampling methodology

15   where a random selection of contracts is pulled, then followed

16   by a stipulation as to the pricing term.  I mean, defense

17   counsel has just said there's no meaningful differences in the

18   pricing term.  That's what we believe too, but the idea that

19   we're going to -- we can't -- we can't achieve finality on the

20   issue of what contract applied to which customers, short of a

21   stipulation, or short of binding testimony from the company,

22   because we certainly -- it's not possible to analyze 200,000

23   different contracts.  And again, it's not our -- that burden,

24   it's not fair for us to bear that burden.

25            So what we would propose is, you know, since we all

1    agree there's no meaningful differences in the relevant pricing

2    term language, let's stipulate to the relevant pricing term and

3    move on.

4          THE COURT:  Well, I think, before you do that, I

5    mean, it seems like first priority is to actually get the

6    documents.  Right?  I mean, all of this stems from the

7    underlying documents which defendants have.

8          So it sounds like the first step would be some

9    agreement between you about using search terms to locate a

10   sample of the relevant documents over different periods of time

11   so that you have a universe of documents to work with.  And

12   then based on an analysis of those documents, it sounds like

13   you would be able to then follow up with a deposition to get

14   binding testimony based on the contracts that you see or

15   perhaps a stipulation if the parties see that there's no

16   meaningful difference in the language of the contracts that are

17   pulled.  But absent getting the underlying documents in some

18   form, it's hard for me to imagine you'll be able to reach -- to

19   get a stipulation from defendants that would be agreeable.

20         So is there some reason why the parties can't agree

21   upon a sampling exercise that allows you to look at a sample of

22   contracts year by year, region by region, so that you have

23   something that you can look at, so you can analyze this

24   question?

25         MR. McINTURFF:  No, your Honor.  We can, we can agree

1    to an appropriate sampling methodology.  We wouldn't need

2    search terms to do that.  Because, again, imagine this

3    database, each customer, Jane Q Public and John Q Public, each

4    have a contract associated with their account.  They have a

5    unique account number.  We can take a random -- a

6    statistically -- oh, now I'm stumbling over my words -- a

7    statistically significant random sample that is representative

8    of the contents of the database, and there's sampling

9    methodologies out there.

10         We've done this in many cases where we can take

11   this -- we can take a sample of the contracts without using

12   search terms.  They would just pull down the ones associated

13   with the various accounts and we would be sure to do it, to

14   pick a number of sampled accounts that would account for the

15   different geographies and time period, and then we can look at

16   those, and I agree, your Honor, I think either we could

17   stipulate or then go forward with the 30(b)(6) deposition.

18         We would be willing to agree to that and we

19   appreciate your Honor's guidance on that point.

20         THE COURT:  Well, so Mr. McLaughlin, is this in line

21   with what you were imagining?  You were imagining some sort of

22   sampling and production of relevant contracts, if I'm

23   understanding correctly.

24         MR. McLAUGHLIN:  Yes, I guess I don't know what --

25   what specifically significant random sampling entails, but I

1    don't think -- I don't want to oversimplify it, but I don't

2    think this is that -- I mean, I agree with plaintiff -- I don't

3    think at the end of the day we are going to find meaningful

4    differences in the contracts over the class period.  And if

5    we're limiting it to the first year, the contracts that have

6    this first year language where -- I don't think we're going to

7    see any changes at all in the Connecticut customers that have

8    that contract.

9         So I think -- I'm happy to work with plaintiffs on a

10   way to give them that sample, but I don't think -- I don't

11   think it's going to require more than picking a couple of

12   months in each year and every branch -- I mean, this is exactly

13   what we did with plaintiffs' counsel in the *Callery* case under

14   the direction of the discovery master in that case, which was

15   pick a couple of months, pick every branch, and produce a

16   sample contract.

17        We've offered to produce all of those agreements to

18   the plaintiffs here.  It was, I think, approximately 200

19   contracts that would show the contract, what it looked like in

20   each branch over the course of the years.  And, to me, that

21   will give plaintiffs what they need.  It should give them more

22   than they need because that is 95 percent contracts that have

23   nothing to do with the actual class in this case, which is the

24   first year customer contracts that only existed in Connecticut.

25        MR. McINTURFF:  If I can just respond.

1          THE COURT:  Yeah, you can, but let me just ask a

2     followup for Mr. McLaughlin.

3          Your suggestion is you use search terms that would

4     limit the sampling to those contracts that included that

5     prevailing retail price language as opposed to I think what

6     Mr. McInturff is suggesting, which is searching without

7     limitation of search terms across regions; is that correct?

8          Mr. McLaughlin, is that what you're -- you're

9     proposing sort of a more narrowed, random sampling.  It sounds

10    like Mr. McInturff, which I'll speak to in a second, is

11    proposing something slightly different.

12         MR. McLAUGHLIN:  Except that the sampling that we did

13    in Pennsylvania was not limited, because that case is more --

14    that class is broader.  That is not limited to the first year

15    customers that is at issue in this case.  So the sampling that

16    we've already done extends beyond the first year sampling.  So

17    those hundreds of contract samples that we've offered to

18    provide capture more than the contracts that are at issue here.

19         THE COURT:  Understood.  Okay, so I get it.

20         So Mr. McInturff, first, why have you not agreed to

21    get at least those 200 contracts defendants have offered and

22    then you can make whatever point you wanted to make?

23         MR. McINTURFF:  Sure, sure.

24         So the reason is that you can't -- we have to assume

25    we're going to have a dispute.  We can't assume that we're

1   simply going to then be able to stipulate on the relevant

2   pricing term.  But it's not an adequate sample to just pick a

3   couple of months.

4          I know a lot of lawyers do that where they'll say,

5   oh, we'll just take a couple of samples in a wage-and-hour

6   case.  We'll give you the hours of people every couple of

7   months.  But when push comes to shove, that's actually not an

8   adequate sample.  We have to design a sampling methodology.  It

9   is going to have a reasonable margin of error.  It can stand up

10  to reasonable critique.  Because in the event that we don't

11  agree, we will put forward a position with respect to which

12  contracts apply to which customers.  And without the basis of

13  an adequate, appropriately represented sampling methodology,

14  well, we can't do that.

15         So that's why we can't agree to just take sort of the

16  every couple of months from defendant.  But, you know, we've

17  done this many times and ultimately the number of contracts

18  that have to be produced is really a function of the different

19  variations, the different facts we're looking at.

20         So we may -- it may be a little larger than normal

21  because of the fact that we're looking at various states, but

22  typically the amount of contracts or the amount of any sample

23  you take is a small fraction of the overall number.  So if

24  we're looking at 200,000 here, I can't tell you the exact

25  number, we do the variables, but my colleagues and I are doing

1    sampling in another case, and we have like a million and a

2    half, the pool was a million and a half, and I think ultimately

3    at a 95 percent confidence we sampled like 400 out of the

4    million and a half.

5            So it's not undigestible, but we just can't take the

6    methodology that was employed in the other case because it

7    won't stand up if we don't agree.

8            THE COURT:  All right, and I was suggesting, I guess

9    I was suggesting why -- I understand why you might want

10   something in addition to the 200 contracts, but why not accept

11   as the low-hanging fruit at least those 200 contracts which

12   they've already collected and you know what the methodology is.

13           Is there some reason, Mr. McLaughlin, that you

14   wouldn't be amenable to producing those 200 contracts that you

15   have already collected from the other case and also agreeing to

16   some additional sampling that would be slightly broader?

17           MR. McLAUGHLIN:  No issue on the first piece of

18   providing those.  I guess my concern is what I just heard,

19   which is it's like we're trying to find an issue that I don't

20   think is going to exist.  When they look at the samples that we

21   produced and they see, I actually don't think we're going to

22   have an issue about what the contract said because there's not

23   going to be a meaningful difference over the years in what

24   the -- the terms have really stayed the same as far as what's

25   at issue in this case.

1              THE COURT:  Okay.  So based on that, Mr. McLaughlin,

2      are you suggesting that because there won't be a dispute, you

3      likely would be willing to stipulate to that issue once you've

4      produced the contracts and plaintiffs review them?

5              MR. McLAUGHLIN:  Yeah, I think perhaps.  I don't know

6      what stipulation they're looking for.  But I think if they

7      review these samples and there's nothing different from -- for

8      what they're looking to litigate.  The contracts say what they

9      say.  I don't see a reason why we wouldn't be able to stipulate

10     to the contract language that we all can look at and see

11     existed over the period of the course of the case.

12             THE COURT:  So the 200 contracts that you have in

13     hand, do they cover the geographic areas that plaintiffs are

14     concerned about in that proposed time period?

15             MR. McLAUGHLIN:  Yes.

16             THE COURT:  Okay.

17             So Mr. McInturff, what about if you -- to get to a

18     quicker result here, what if you got the 200 contracts that

19     they already have in hand, you reviewed them and then propose a

20     stipulation based on your review that essentially gets you what

21     you need in terms of having defendants agree that these are the

22     pricing terms that applied to these customers in these

23     geographic reasons over this period of time.

24             That would get you -- if defendant is right that you

25     will have reviewed them and you'll be able to craft a

1   stipulation so this won't be a disputed issue, would that serve

2   your purposes or would there are something missing from that?

3          MR. McINTURFF:  If we can ultimately agree on a

4   stipulation, it would serve our purposes.  The issue that I'm

5   concerned about is if we can't agree, the cost to us to review

6   and analyze 200 contracts is going to be wasted when an

7   adequate sampling -- the cost to do an adequate sampling is

8   going to be as easy as working on a sampling methodology, which

9   we've done many times, and I'm confident that defense counsel

10  has seen similar sampling methodologies.  And then going and

11  doing the sampling methodology, which, again, I don't think is

12  going to end up pulling materially more contracts than the 200

13  they've got and then that way we do it just once.

14         But if your Honor's suggestion and defense counsel is

15  so confident that we're going to be able to stipulate on the

16  basis of what has already been pulled, we'll go with that, but

17  we want to reserve our rights and make clear that if we aren't

18  able to agree and then we have a dispute about which language

19  applies, then we would have to do sampling.  So our position is

20  let's go ahead and do the sampling because it's not that much

21  more burdensome than what's on the table and that way we can

22  just do it once.  But if your Honor and defense counsel think

23  that it's -- that that's unnecessary, we'll go forward with the

24  200, but we may have to go back if we can't agree.

25         THE COURT:  And how large of a sample are we -- I

1    guess, Mr. McLaughlin, in terms of, if we were to do a slightly

2    broader sample, but that would amount to, I don't know,

3    slightly more than 200, it sounds like it wouldn't be

4    substantially more at all, how long would it take for you to

5    accomplish that sampling and production do you think?

6           MR. McLAUGHLIN:  Your Honor, today is the first time

7    I've heard any request to do any sampling.

8           THE COURT:  Okay.

9           MR. McLAUGHLIN:  So I don't know what it entails.  It

10    sounds like they're not saying they don't want to use search

11    terms.  I don't know what the parameters of that sampling are.

12    If it's something that our vendor can, based on what the

13    request is, can run that through the database of contracts

14    fairly easily, I don't object to that.  I don't know what it is

15    that they are asking us to do to come up with a sampling.  We

16    had no discussions about that previously.

17           THE COURT:  Okay, understood.

18           MR. McLAUGHLIN:  Maybe it is easier.  I don't know.

19           THE COURT:  Okay.  Well, let's see, I think that it

20    sounds like the first step would be for plaintiff to come up

21    with a proposal and for the parties to meet and confer about

22    what a sampling of the 200 -- is it 200,000 contracts in the

23    database, Mr. McLaughlin?

24           MR. McLAUGHLIN:  Yes.

25           THE COURT:  Okay.  So what their sampling proposal

1   would be so that you can meet and confer.  Ideally, the parties

2   would agree upon some sort of methodology and a protocol for

3   the sampling.

4           You'd be able to, Mr. McLaughlin, take that, have

5   your vendor do it and produced fairly quickly, and then based

6   on that production, plaintiffs would be able to determine for

7   themselves whether the parties could stipulate to these various

8   issues relating to which pricing terms applied to which

9   customers, or whether they need to seek depositions, either by

10  30(b)(6) or some other method, to get the binding testimony

11  they need about the issues at play here.

12          So how long do you think, I'm mindful of the fact

13  that you have these discovery deadlines and you need to move

14  things along, and I recognize that these issues have taken some

15  time to work themselves out.

16          So how quickly, Mr. McInturff, would you be able to

17  come up with a proposal and then meet and confer with

18  Mr. McLaughlin?

19          MR. McINTURFF:  I think I could come up with -- I

20  could transmit a proposal to Mr. McLaughlin by the end of this

21  week in terms of the methodology.

22          THE COURT:  Okay.  I know it will take some time for

23  you to work through that, so how about the parties meet and

24  confer about this contract issue, see if they can come to an

25  agreement about a sampling methodology for the contracts in the

1  database and then report back to the Court by Friday,

2  November 10 as to the status of the negotiations and whether

3  you're moving towards a resolution of getting those contracts

4  produced.

5       MR. McINTURFF:  That works for plaintiffs.

6       MR. McLAUGHLIN:  That's fine.

7       THE COURT:  Okay.  So what is the next issue that you

8  wanted to address, Mr. McInturff?

9       MR. McINTURFF:  So the next issue we turn to ECF 77

10  in our discovery letter motion.  So if your Honor wants to take

11  it in bites, the first would be our request for the information

12  requested in interrogatories number one and two in our third

13  set of interrogatories, and that's under the heading in the

14  letter.  Starting on page 2, it's item B-1 that says Hop must

15  provide basic information about its rate-setting practices.

16       The background here is interrogatory number one asks

17  Hop to identify the category, the data, and documents that it

18  relies on and references when setting heating oil rates.  And

19  then the interrogatory number two asks for Hop to provide a

20  description of its wholesale purchasing practices.

21       Both of those -- both of that requested discovery is

22  relevant because, first of all, again, as I mentioned before,

23  Judge Karas found that the contract at issue that applied to

24  plaintiff Melville requires that Hop's prices fluctuate as its

25  price to procure heating oil changes.  So identifying the

1     categories of documents and data that Hop relies on when

2     setting its heating oil prices, that's interrogatory number

3     one, is germane to that question because whether or not that

4     sort of process follows the contract is going to be relevant to

5     our claims.  And we cite the summary judgment opinion issued on

6     August 14, 2023, in the Eastern District of New York in a case

7     *Mirkin v XOOM Energy*, where the Court relied on documents that

8     were considered at rate-setting meetings in determining that

9     the defendant had not established that it had followed its

10    contractual pricing term.

11          Similarly, our good faith and fair dealing argument

12    is that Hop, to the extent Hop had discretion set rates, the

13    process could show whether Hop exercised its discretion in good

14    faith.

15          So, again, interrogatory number one says identify the

16    categories of documents and data Hop relies on when setting

17    rates.  We think that's relevant.

18          And then interrogatory number two to describe Hop's

19    wholesale purchasing prices.  Again, if the contract price is

20    tied to Hop's cost of oil, we want to see how Hop is purchasing

21    its oil, what the practices are.  Is it buying on the spot

22    market?  Is it buying a day ahead?  Is it hedging?  So that's

23    going to help us determine whether or not prices, Hop's prices,

24    were tied to the pricing term in the contract.

25          And then, again, to the extent that Hop has more

1    discretion, and we believe for the duty of good faith and fair

2    dealing description of Hop's wholesale purchasing practices

3    will shed light on whether Hop set its rates in good faith.

4            So both of these requested items are relevant.  Hop's

5    responses were boilerplate.  They did not -- it did not

6    establish any overbreadth or burden, and so we don't think that

7    they've met their burden to resist this discovery.

8            In addition, Hop's last argument is that we have

9    exceeded 25 interrogatories.  We have not.  This is a counting

10   dispute.  The defendant went back, defense counsel went back

11   and counted our last interrogatories that were issued to the

12   prior counsel and has come up with a new counting mechanism

13   that is saying that they don't have to produce this discovery

14   because we've exceeded 25, and we don't believe we have,

15   because the case law is clear that if it's logically or

16   factually subsumed, it's a single interrogatory.

17           And more importantly, this is a complex litigation.

18   We just got finished with a conversation about 200,000 separate

19   contracts.  To the extent that the Court doesn't want to engage

20   in the counting analysis, we think it's more than reasonable

21   that these interrogatories are very (indiscernible) in

22   efficient ways to elicit the requested discovery.

23           So to the extent that even if defendant were right,

24   we think that they should still be required to respond to this

25   information because this is critical additional discovery.

1          THE COURT:  Okay.

2          So Mr. McLaughlin, at least with respect to

3    interrogatory number one, what is your argument as to why you

4    shouldn't respond putting aside the counting issue?

5          MR. McLAUGHLIN:  So aside from the counting issue, I

6    think that this is information that plaintiffs have sought and

7    through their document requests we have agreed on the -- we

8    have proposed the data sources that we would run searches for

9    that would include this information and we are -- we've now

10   received their search request.  We're going to respond.

11         I think that the -- I think that sequentially this

12   should proceed with documents after the document discovery is

13   complete, then they can take depositions.  I don't think an

14   interrogatory is the most practical way of getting this

15   information.

16         I think that it is much more appropriate to proceed

17   with the document search and they can review the documents that

18   we produced that will educate them about this process, and then

19   they can take depositions of witnesses about this process.  I

20   just don't think interrogatories is the most appropriate

21   discovery device.

22         I think it would be -- I think it would be the most

23   burdensome for the defendant.  I think it should -- and I don't

24   think -- I think Rule 33.3 contemplates that, that

25   interrogatories of this nature follow only if document

1    discovery in depositions are not the most practical.  And we

2    haven't even produced the subset -- we haven't even agreed yet

3    on the search terms to get these materials.  I think it should

4    just take place in the, I would say the more traditional

5    sequencing.

6              THE COURT:  So Mr. McInturff, so am I correct, then,

7    that was my next question, you've asked for, if we just look at

8    interrogatory number one, which asks to identify the categories

9    of data and documents relied upon or references setting its

10   variable rates, et cetera, have you requested those same

11   documents in your document requests?

12             MR. McINTURFF:  We have requested documents in our

13   document requests that we believe will encompass this

14   information.

15             But going back to local Rule 33.3, it contemplates

16   requests for the existence, location, and general description

17   of relevant documents.  That's what we're asking.

18             We're saying help us understand what categories of

19   documents Hop is relying on or referencing when they're setting

20   heating oil rates so that we can then follow up with more

21   targeted requests.  If they're telling us -- my understanding,

22   based on conversations with counsel is there really aren't any

23   documents that they're relying on, and so we ask this, in part,

24   to button that issue up.  But if there are documents that are

25   being relied on to set rates, we want them to be identified.

1    If they can't identify them, that's certainly germane to our

2    claim that they can't identify whether or not they're -- what

3    documents they're relying on to set rates.  And again, it's

4    well within the, within the scope of 33.3.

5            So what we would expect, what we expected is, is the

6    defendant would just answer the question because there's no

7    reason for -- this is essentially a policy question and there's

8    no reason for us to have to piece together from document

9    discovery what the defendant's practices are.  And again, we're

10   just saying identify the documents you rely on in setting

11   rates.

12           THE COURT:  So Mr. McLaughlin, you referred to

13   document production.  So the way you would proceed is you view

14   these as documents that have been requested.  So you will then

15   go about doing searches to identify these responsive documents;

16   is that right?

17           MR. McINTURFF:  That's right.

18           THE COURT:  Okay.  And you would do that however you

19   do it through search terms, however you decide is the best way

20   to respond.  So in doing that, don't you necessarily have to

21   identify where you're looking for those documents?  I'm

22   wondering why you believe it's burdensome to just indicate

23   where the documents -- what types of categories of documents

24   you're relying upon in producing the documents to plaintiff.  I

25   haven't made a decision about how I'm going to rule on this,

1    I'm just asking the question.

2                What is so burdensome about that piece?

3                MR. McLAUGHLIN:  So the burdensome objection was with

4    respect to the way that interrogatory one is drafted.  Again,

5    this case is limited to, and plaintiffs' prior submissions to

6    the Court made clear that their case is a much more narrow case

7    than the *Callery* case, when there was a request by prior

8    counsel to stay this litigation pending the outcome of that

9    prior-filed case, that this was a subset.  That this is only

10   dealing with first-year customers, not all of the other

11   contract types that are out there.  And this request is not so

12   limited.

13               And so that's -- this is identify the category of

14   data and documents that defendant relies on basically with all

15   of its rate setting or pricing without limitation.  So that

16   was -- that was the basis for the overburdensome objection.

17               To your point, it's not -- I don't think the burden

18   would be high to identify, for example, the various pieces of

19   information that, in general, over the years, the company has

20   considered when setting its first year promotional retail

21   price, which is the issue in this case.  We've relayed that

22   information to plaintiffs' counsel how, in general, the company

23   sets that price and has over the years.

24               So my view was we've relayed that.  We've given them

25   the date.  We've given them the proposed data sources that

1    includes the folders and the mailboxes of the person that's

2    responsible for -- largely responsible for setting these prices

3    and has been during the entire class period, that they can run

4    the searches and they will receive the documents.

5         THE COURT:  Okay.

6         Mr. McInturff, why is that not sufficient?  Because,

7    in my view, Rule 33 does allow for parties to respond to

8    interrogatories such as this by saying, see the documents, if

9    that's a most efficient way to do it.

10        MR. McINTURFF:  Well, first of all, it's definitely

11   not the most efficient way.  What defense counsel just said is

12   is we've identified a custodian and you can search his email to

13   tell us whether or not there's anything in the custodian's

14   email inbox that answers this question.  I mean, that is

15   definitely not the most efficient.  That's the least efficient

16   way to do it.

17        Again, we're asking for them to identify the

18   categories of data and documents they rely on in setting rates.

19   And counsel alluded -- he said that he's already sort of

20   disclosed it.  What he disclosed to us is that they didn't --

21   they sort of, you know, stuck their thumb up in the air and

22   felt where the wind was blowing.  So we want an admissible

23   answer as to that question.

24        And I will say also, defense counsel is changing his

25   objection.  He said he objected on the basis that he thinks the

1   class is more narrow than it is.

2          First of all, we're entitled to class-wide discovery

3   in order to define the class.

4          Second, that's not what the objection says.  This is

5   straight boilerplate and we shouldn't be required to file a

6   motion to hear defense counsel's true concern here.

7          We're entitled to rely on the objection that's

8   written in this interrogatory response and it is complete

9   boilerplate.  So I don't think defense counsel should be

10  permitted to amend their response.

11         THE COURT:  And then finally, your Honor, the point

12  that your Honor made about being able to produce documents in

13  response to an interrogatory, they would need to identify by

14  Bates stamps the documents that are responsive to this.  They

15  haven't done that.

16         Again, this is -- this is a simple question.  I think

17  the reality is, is defendant doesn't have a good answer, but

18  we're still -- we're still entitled to the answer to the

19  question because it's well within the -- what's contemplated by

20  Rule 33.

21         MR. McLAUGHLIN:  Your Honor, can I just respond

22  briefly to that?

23         THE COURT:  Yes.

24         MR. McLAUGHLIN:  I certainly did not convey and it is

25  not the case that my client puts its thumb in the air to come

1    up with pricing.  That is simply false.

2             I did not -- it is not required by the rule to

3    identify by Bates number if you're going to produce documents

4    in response to -- in lieu of answering an interrogatory.  The

5    rule provides that if documents are a more appropriate and

6    sufficient way to provide the information that the party can

7    produce those documents, there's not a requirement that they

8    are identified by Bates number in the interrogatory.

9             And these are not -- I disagree that they're form

10   objections.  We included these specific objections.  When we

11   had a meet and confer on these requests, the only issue that

12   plaintiffs raise was our objection that this exceeded the

13   number of 25, which we stand by, and we think that if you look

14   at the prior interrogatories, that that was also a valid

15   objection.

16            So I don't think that we're changing our position.

17   That's always been our position.  I think our objections have

18   always been valid.

19            THE COURT:  Okay.  And is there some reason why,

20   Mr. McInturff, you're asking for categories of data and

21   documents that go beyond the promotional rates that are at

22   issue in the case, concerning Mr. McLaughlin's point that

23   you're asking for a whole host of other type of rate-setting

24   information?

25            MR. McINTURFF:  Sure, sure.  There's two points.

1          One is, that, again, the class is not necessarily

2    limited to customers that had identical contract language.  In

3    fact, in the *XOOM* case that we cited, the Eastern District of

4    New York, the Court there recently certified a class that

5    included customers with substantially similar language to the

6    language that the plaintiffs had.

7          But more importantly, how the defendant sets its

8    other rates also sheds light on how they either could have or

9    arguably under the contract should have set its rates

10   applicable to class members.

11         So one of the things that's very common in these

12   cases is that the defendant will have a rate-setting process

13   for capped or pre-buy rates, which is essentially where the

14   customer locks in, locks in the rate ahead of time.  The way

15   that a defendant energy company will set the rates on a

16   locked-in price will have far less more than anything profit

17   margin built in because the defendant knows that the price is

18   what it is and the customer knows the price.  But with the

19   variable rates, the customer doesn't know the price ahead of

20   time, and so what they'll do is they'll charge a much, much

21   higher margin.  So when you look at the categories of data and

22   documents that are considered in those various rate-setting

23   capacities, you can see very wide differences in the way

24   variable-rate customers like proposed class members in this

25   case are, how the pricing methodology was made as compared to,

1    say, capped or pre-buy customers.  So that's why we're asking

2    for the additional information.

3            But, again, I want to emphasize, the underlying

4    business here is they're buying home heating oil at wholesale

5    and they're reselling it.  There's not going to be a lot of

6    datapoints that they're going to be relying on, and so why they

7    can't simply respond to the interrogatory under oath and

8    provide the information, we believe, again, the real reason is

9    is the answer is not going to be very good for defendant's

10   merits defense, which is why we ask the question at this

11   juncture, after we have spent many months trying to get to the

12   bottom of discovery and what we're beginning to understand is,

13   in fact, there was no sort of real reliable methodology that

14   based rate setting on the terms of the contract as Judge Karas

15   has construed it.

16           So we think the appropriate thing to do is order

17   defendant to answer the interrogatory and then we can move on

18   from there.  If we need additional document discovery to get to

19   the bottom of the issue, then we'll issue additional discovery.

20   But this idea that we sift through document discovery on such a

21   straightforward issue, we just disagree that that's the most

22   efficient way.

23           THE COURT:  Okay.  So based on what I've heard,

24   here's my view.

25           For interrogatory number one, which refers to the

1  various rate setting, I believe that the interrogatory should

2  be limited to the promotional variable rates or similar rates

3  relating to the contracts at issue, not the whole host of other

4  rates that don't apply directly to the case.  Number one.

5          Number two, defendants can respond to this

6  interrogatory by producing responsive documents that would

7  respond to that request, but in doing so, should identify the

8  Bates range produced in response to this interrogatory.

9          To the extent that plaintiffs are seeking admissions

10  relating to the point you made, Mr. McInturff, that you don't

11  believe that there was a real way in which they were rate

12  setting and the like, I don't think you're ever going to get

13  that response or admission in a way that's clean and that won't

14  be disputed in an interrogatory, and I think the most efficient

15  way is for you, in the first instance, get whatever documents

16  are responsive to this and then seek testimony that would get

17  you the admission that you want.  I think doing it by

18  interrogatory is going to actually lead to more disputes.  It

19  won't shore circuit things.  It will actually extend and delay

20  things.

21          Moving to the second interrogatory, that's describing

22  with particularity defendant's wholesale purchasing practices.

23  I think we haven't yet argued about this yet, but just to cut

24  to the chase, I mean, the way I read this interrogatory, it's

25  not in keeping with Rule 33, the local Rule 33.3, because it's

1  going beyond just asking for basic information.  It's actually

2  more in line with the contention interrogatory that's asking

3  for descriptions and particular purchasing practices and the

4  like.

5          So I think at this stage of the litigation, it's

6  premature to ask this type of interrogatory.  It would be

7  better suited to later in the litigation or in deposition.

8          MR. McINTURFF:  Okay.

9          THE COURT:  So the next issue is -- what's the next

10  issue that's ripe for -- is that interrogatory number three?

11          MR. McINTURFF:  Interrogatory number three, yes.

12          THE COURT:  Okay.  Go ahead, Mr. McInturff.

13          Looking at this, my initial view is that it is

14  lengthy.  It has a lot of subparts, some of which seem to be

15  things that can be derived from the underlying contracts

16  themselves, unless I'm mistaken.  Others, I'm not sure where

17  that information derives, but it looks like it's, for example,

18  data analyzing external prevailing retail rates, data relating

19  to rates for home retail oil charged by defendant's

20  competitors, all the compilations of retail rates for home

21  heating oil collected by third parties and the like.

22          To me, they are not subsumed under just one category

23  of information.  They seem like many, many subparts that aren't

24  necessarily all related.

25          So I guess that was my first take when I looked at

1   this very long interrogatory with all of these various

2   subparts.  So perhaps you can explain to me what exactly are

3   you looking for?  What are you hoping to achieve by this

4   interrogatory?

5          MR. McINTURFF:  Sure.  So we're hoping to achieve the

6   identification of the data that we're going to use to build our

7   damages model.  We've issued this interrogatory in many other

8   cases, and typically the response we get is the overwhelming

9   majority of the information in this interrogatory is contained

10  within the customer database, which is what we believe is the

11  case.

12         You know, I should tell your Honor that we're

13  negotiating a production of class member, proposed class

14  member, potential class member data from the defendant's

15  database.  Much of this information is expected to be in the

16  database and then there may be a few different discrete items

17  of information that are outside of the database, and we're

18  asking the defendant to identify for us.  So I would expect

19  customer name, customer account number, if the customer was

20  acquired from another home heating oil company, identify that

21  company.  That's all database information.  The customer's

22  pricing term.  You know, I think the answer to that is that

23  that's not available.

24         The time in which the customer was charged the

25  pricing rate described above.  Similarly, we should be able to

1      get the time periods, service address.

2              Again, most of this is database related information.

3      We just want the defendant to identify the location of this

4      information, and then if there's other items that are likely

5      not within a database like, for example, J or K data

6      identifying retail rates for home heating oil charged by

7      competitors, either they have that data in a specific location

8      or they don't.

9              The same thing is analyze -- K, data identifying,

10     describing, or analyzing any compilations of retail rates

11     reflected by the US EIA.  Either they have it or they don't.

12             If you looked down at L, that's delivery date.

13     That's going to be database data.  Price, M, is database data.

14     N, is database data.

15             So I think your Honor can get the idea that we've --

16     these are critical datapoints that we're asking and that's why

17     it's all one interrogatory for accounting purposes.  These are

18     datapoints that we're requesting that the defendant identify

19     the location.  I don't think it would take much more time than

20     this call for the defendant to answer the interrogatory and

21     then we can have much more streamlined discovery.

22             THE COURT:  Okay.  So Mr. McLaughlin, what's your

23     response to that?

24             MR. McLAUGHLIN:  So our position is that -- to your

25     Honor's point, these are, in our view, 26 separate

1    interrogatories, but I think our general view is the same as it

2    was previously.

3            This is information that -- I agree with plaintiffs'

4    counsel that this is largely information that is, if it's

5    available, it's in the database.  We have already produced to

6    plaintiffs every account.  We've given them what our database

7    has.  Every field that it has.  We've given them the actual

8    data in that field for the named plaintiff with the expectation

9    that we will then negotiate which specific fields they want us

10   to provide for their proposed class.

11           But to the extent that it's not in the database, that

12   is the place where I agree where this information, if it

13   exists, should be produced from.  Some of the other discrete,

14   subpart interrogatory questions here I think, again, it is a

15   request that is built into their search terms and then they

16   will get the documents.

17           To the extent that they want documents related to K

18   or J, then they've already offered search terms that will

19   identify those documents and, again, I think that is the more

20   appropriate approach here, is to produce the documents,

21   including the database information and then, if necessary,

22   depositions, not interrogatories.

23           THE COURT:  So Mr. McInturff, why -- so you're

24   getting the documents through this database where this

25   information comes from.  I mean, the purpose of this

1  interrogatory is to streamline and to figure out where

2  information is.  If you're already in the process of

3  negotiating search terms and getting the actual documents, why

4  do you need this interrogatory?  What do you gain by having

5  defendants go through this exercise with you if you're already

6  doing it in a more informal way through meet and confers?

7        MR. McINTURFF:  Well, there's two points.  The first

8  is for the items that we agree are in the database, the

9  defendant -- we have been asking the defendant now for weeks to

10  define the fields of the database that they produced.  So they

11  produced a whole list of fields with a lot of internal sort of

12  nomenclature, and we've been asking them to tell us what the

13  fields mean.  And this interrogatory is meant to get at the

14  identification of which fields in an admissible format,

15  because, again, we're putting together a damages model.

16        So that's one.

17        And if there's an alternative to answering the

18  interrogatory, the Court wants to order defendant to identify

19  all of the database data fields that it has produced, that

20  could get us through most of what's in the interrogatory.  But

21  then, in addition, there's items in here that are not in the

22  database and consistent with Rule 33 point -- I think it's

23  Rule 33.3, we're asking them to identify the categories and

24  location of where this information exists, if it does.

25        So we're certainly not going to get that from the

database production.

THE COURT: Right, but it sounds like to the extent you're requesting these documents -- am I correct that separate and apart from this interrogatory asking for identification of categories of documents and data locations that you're separately negotiating a protocol to get those documents the produced to you.

MR. McINTURFF: Well, we have proposed search terms. We haven't -- the defendant has not responded to our search term proposal. We are still trying to work out an ESI protocol. But again, whether our discovery requests are going to ultimately yield the data that we're interested in is being sought by this interrogatory is not clear to us. I mean, we haven't had anything produced.

And again, what we're asking for is the defendant to simply identify where the categories of documents and data locations.

We don't have to take it in the order in which defendant is proposing where they just produce a bunch of documents and then we figure it out. We're entitled to know where relevant documents reside, and they should be required to tell us so that, to the extent that we have issues with the defendant claiming our requests were not sufficiently particularized, we can turn around and we can say, okay, here's a more specific request.

1    I mean, they're going to have to collect this

2  information anyway, so they're going to know where they're

3  going to collect it from, so they should be able to tell us

4  where it's located.

5    THE COURT:  Starting with the fields of the database,

6  so that seems like the easiest one.  It seems like some subset

7  of these subparts in interrogatory number three are deriving

8  from the database and the parties seem to agree to that.

9    So your issue, it seems, Mr. McInturff, is that you

10  want defendants to define the fields of the database for you.

11    Do you have any problem with doing that,

12  Mr. McLaughlin, providing a definition of the various fields of

13  the database that you're agreeing to search?

14    MR. McLAUGHLIN:  So the issue, your Honor, there are

15  a lot of fields.  There are a lot of fields that Hop doesn't

16  even use.  There is not a -- they do not have a glossary of

17  terms for these fields.

18    We have repeatedly asked plaintiff to tell us what

19  you want.  Tell us what data you think you need for your case.

20  We will then go back and figure out with our client which

21  fields, if they provide that data.  And then we can talk to you

22  about those fields and we can give you definitions, explain

23  what those fields mean.

24    Plaintiff has resisted doing that.  They don't

25  want -- they don't want to limit it.  They want to say, they

 1    have said, no, you tell us every field that exists and come up

 2    with a definition of what all those fields mean, then we'll

 3    pick from that list after we get -- after you do all of that

 4    work, then we'll decide which of those fields we think we would

 5    want.

 6              That is just not a -- we are working with our client

 7    to come up with -- because this is all -- this is all --

 8    there's not information that currently exists.  Somebody would

 9    have to actually create product to provide these definitions

10    and I think that is beyond the scope of the discovery.

11              We're not opposed to providing information.  For

12    example, we did this, again -- I don't want to keep relying on

13    the other case, but we had this same issue in *Callery* where

14    that is how it played out.  Plaintiffs' counsel gave us --

15    handful of categories of data that they wanted.  We agreed with

16    the discovery master that we would come up with the definition

17    for those specific fields that are at issue.  I think that is

18    more reasonable than what plaintiffs are asking here, which is

19    come up with a definition for every field, whether we

20    eventually want to look at it or not, and then we'll decide

21    which of those we think we should ask you to search.

22              THE COURT:  So looking at interrogatory number three

23    and the various subparts, are you able to look at that list and

24    identify with your client whether any of those categories are

25    fields in the database?

1           Okay, so in the first instance, can you do that?  Go
2   back to your client, look at this list and say -- because this
3   appears to be the list of fields plaintiff wants.  That's the
4   way I read interrogatory number three.  These are be these are
5   fields of data that they want.  So to your point, give us the
6   list.  This seems to be the list.

7           So if you take that list and go to your client, can
8   you determine whether the database has these fields and, if so,
9   define them for the plaintiffs, and if they don't, that's a
10  separate issue which we'll get to.  But in the first instance,
11  it seems like that's something you can do, right?

12          MR. McLAUGHLIN:  Yes, that's something we can do.

13          THE COURT:  Okay.  So I think first step may be with
14  interrogatory number three is to take this back, identify which
15  of these categories of information are fields in the database
16  and let plaintiffs know, if that's the case, and to the extent
17  they need a definition of those fields, to provide it to them,
18  although it seems like it would be self-explanatory.

19          MR. McLAUGHLIN:  And I think we have mostly this
20  because we've given them all of the data for the plaintiff, and
21  we've given them all of the fields that we have, and it's
22  populated with all of the data.  So I think for most of this
23  they already have it.  But I'm happy to, as a separate
24  exercise, go back and answer that question.  But I think we
25  have already provided that to them in large part.

1           THE COURT:  All right.  It sounds like you probably

2    have, but to try to address or resolve this issue of

3    interrogatory number three and the fields, the fields of the

4    database that the plaintiffs are seeking, it seems like

5    confirming that would be the first step.

6           Then I take it there will be some subset of what

7    falls out in interrogatory number three that is not identified

8    and doesn't come from a database; is that correct,

9    Mr. McLaughlin?

10          MR. McLAUGHLIN:  Yes.

11          THE COURT:  I'm assuming there's some subset that

12   would not be in the database.

13          MR. McLAUGHLIN:  Yes.

14          THE COURT:  Okay.  So to the extent that it's

15   information that plaintiffs are requesting be produced in the

16   case, I guess the first question is, are you -- is it your view

17   that these are responsive, meaning you have documents that

18   would be responsive, you're not objecting on relevance grounds

19   to producing documents in these subparts.  What you're

20   objecting to appears to be the exercise of identifying the

21   locations of where these documents are located; is that

22   accurate?

23          MR. McLAUGHLIN:  I think that's accurate.  We have

24   not -- we have proposed to plaintiffs with respect to our

25   document search that we -- I mean, a pretty extensive data

1    source that limits the mailboxes of certain custodians, but

2    otherwise searches, effectively, the company's entire share

3    drive, which houses all of its documents.  So I think we would

4    want to put limits on -- that's what we're working through with

5    the ESI protocol -- but, no, we have not said we will not

6    entertain any search terms on any category.  We've not made any

7    sort of categorical objection to search terms that would get at

8    many of these categories.

9            THE COURT:  Okay.  And in doing that, you already

10   identified or it sounds like you already know what the sources

11   of that information are; these share drives and the custodian

12   files of various people.  Those are the categories or the data

13   locations that you're planning to search using these searches.

14   I'm assuming you know what that is.  It's not a black box.  You

15   know where you'd be searching.

16           MR. McLAUGHLIN:  We know where we'd be searching,

17   yes.

18           THE COURT:  Okay.  So I guess why is that hard to

19   provide, either through this interrogatory or informally

20   through emails, explaining to the defendants where you plan to

21   search as part of this ESI protocol?  Is that what's in dispute

22   here or am I missing something?

23           MR. McLAUGHLIN:  I mean, we have.  We've told them.

24   We haven't heard any response to when we -- other than they've

25   asked us with respect to the various custodians what's the size

1   of their mailboxes and are you proposing any limitations on

2   running the searches in them?  And we've provided that

3   information to them.

4            What we haven't done, which I don't think is -- we

5   have not, within the share drive, tried to identify among the

6   thousands and thousands and thousands of folders that live

7   within the share drive that may have information sort of try to

8   specify or understand what categories of documents might be in

9   each of those folders.  We're going to run searches across the

10  universe.

11           So, I think, you know, other than saying that the

12  information lives either in the database or in the share drive

13  or in the emails of the custodians, I mean, that is the

14  universe of where our information lives, which we have

15  absolutely conveyed to the plaintiffs.

16           THE COURT:  Okay.  So why, Mr. McInturff --

17           I understand.

18           So Mr. McInturff, why is that insufficient?  I feel

19  like defendants are giving you -- if the goal is to get the

20  underlying information, understand and streamline where you're

21  getting it from, they've provided you that information.  I

22  don't understand why it benefits you to have them separately

23  identify which particular custodian or which particular part of

24  the share drive the document is coming from.  All of that

25  information would be in the metadata that you would get when it

1    gets produced.

2        So why go through this additional exercise when the

3    end of the day you're going to get the underlying documents and

4    you're going to know where it comes from?

5        MR. McINTURFF:  So again, we're talking about the

6    items that are not covered in the database, right?

7        THE COURT:  Yes, that's what we're talking about.

8        MR. McINTURFF:  Yes.  So the reason to ask is we're

9    looking for categories of documents that the defendants have

10   that they're using in the course of their business.  So the

11   idea that something from a shared drive is going to hit on a

12   search term and then be identified as responsive, is very

13   different than asking them, please identify any categories of

14   documents and data location that contain, for example, data

15   identifying, describing, or analyzing what home -- the retail

16   rates for home heating oil charge by defendant's competitors.

17       What I've seen in other cases is the defendant will

18   say we've got a workbook where we gather the information and

19   that workbook is updated monthly.  And then we know, we know

20   that that is a source.

21       This is a prior step to -- and if I can just advise

22   the Court where we are in the process.  We're in the process of

23   negotiating an ESI protocol.  We have other disputes here that

24   we've raised about the defendant's refusal to provide its

25   sources of ESI.  We've asked via this interrogatory for them to

1  identify critical data, data that we believe is going to be --

2  locations of documents that we believe are going to be critical

3  to the case.  We'd expect them to identify it.

4  Again, we asked a series of questions about database

5  data.  We've asked a series of questions about other categories

6  of documents that we think are germane and we shouldn't have to

7  wait for a large scale document production and an ESI search

8  for them to simply identify categories of data that meet this

9  definition.  So that's why we asked for it, notwithstanding the

10  fact that we're going to engage in a broader search term

11  search.

12  THE COURT:  Okay.  In my view, though, the ultimate

13  goal of interrogatories like this is so that you can target

14  where to search and find and locate the documents that you

15  want, and it appears that you're already doing that through the

16  protocol and through the searching of the documents.

17  So I think the most efficient way at this stage of

18  the case, given the deadline looming, fact discovery deadline

19  is, one, to have defendants go back, review interrogatory

20  number three and identify with their client which of these

21  items come from the database.  Let you know, confirm that with

22  you, and to the extent you need information to define the field

23  of that database, if it's not already self-evident by this

24  subpart that's described in interrogatory number three, that

25  they provide that to you.

1    For the other information that's not in the database,

2  the parties should proceed with defining a protocol and search

3  terms and searching and producing these documents.  And I think

4  it's defendant's obligation to produce responsive documents, to

5  locate where those documents are and to produce them.

6    If at some point after, you know, you receive

7  documents, you review the documents, you're not getting the

8  information you need, or you think that there's some source of

9  information that's lacking, then come back to the Court and we

10  can address it.  But I think at this stage, let's proceed with

11  getting the documents, the underlying documents, produced when

12  it comes to those documents that are outside of the database.

13    And it sounds like defendants are willing to do that

14  and capable of doing that, and I think that will be the most

15  efficient way to proceed at this stage.

16    MR. McINTURFF:  Okay.

17    THE COURT:  What is the next, if any, issue that

18  needs to be addressed?

19    MR. McINTURFF:  So the next issue is the next

20  paragraph in the same section, too.  We've asked for Hop,

21  consistent with your Honor's model ESI order, and I'll give

22  some background.

23    On July 12 when Hop's prior counsel started making it

24  apparent to us that they couldn't locate the contracts and

25  other sort of preliminary discovery documents, we looked at

1    your Honor's model ESI order and we asked the defendant to

2    provide disclosure as to the steps Hop has taken to preserve

3    data.  Hop's sources of potentially relevant data.  The

4    programs and the manner in which the data was maintained.

5    Identification of computer systems used and then

6    identifications of individuals responsible for data

7    preservation.

8            Those items were taken almost verbatim from the model

9    ESI order and we think that it's more than appropriate for

10   defendant to make these disclosures.  Again, we're in the

11   process of negotiating an ESI protocol.  The parties have

12   agreed that we're going to agree on the ESI sources that Hop is

13   going to collect and so, you know, many of these items from

14   your Honor's model ESI order relate to, you know, the data

15   that's ultimately going to be collected.

16           And then there's some sort of preliminary stuff about

17   data preservation that we'd like to know given that, for

18   example, we've had this issue with contracts.  I'll say prior

19   counsel also advised us that a litigation hold had been issued

20   but only one hold issued to a nonemployee, and then we ask

21   whether that nonemployee was directed to advise other employees

22   of the litigation hold.  We were told that that was privileged.

23           So we have some concerns about preservation and so we

24   resorted to your Honor's model ESI order and asked these five

25   simple questions, which again are basically verbatim from the

1    model order.  We don't think there's any reason for Hop to
2    withhold this information.
3            THE COURT:  Okay.  Mr. McLaughlin.
4            MR. McLAUGHLIN:  Your Honor, I think, again, we
5    weren't involved, obviously, with prior counsel's discussions,
6    but with respect to the Rule 26(f) discovery planning, our view
7    was we took over the case, we understood that we had discovery
8    deadlines.  We sort of wanted to kind of leap over and get to
9    the meat of they want documents, tell us what you want.
10           We told them where the information lives, what I
11   previously outlined for the Court.  We said, let's move on
12   to -- I don't know that it's so productive to continue talking
13   about process and procedure when we've told you that we're
14   basically going to run very broad searches across our data and
15   get you documents.  Let's focus on negotiating search terms.
16           So I think we're making progress in that front.  I
17   just don't know why it seems like to now turn around and say,
18   well, yeah, but now we want to go back and start talking about
19   where does data live, and all of these things that I think
20   we've already -- aren't really relevant now that we've told
21   them the extent of what we're going to search.
22           So my view is it's unnecessary at this stage.  If
23   they have an issue with our proposed custodians, we can talk
24   about that.  If they have an issue -- in terms -- and now with
25   respect to the litigation hold, there's been no suggestion that

1    that information hasn't been preserved.  We have told them --

2    the contract issue, I think, speaks to that.  We preserved

3    every single contract.  We have the database that is intact.

4    We've given them the particulars on all the custodians and the

5    fact that emails have all been preserved.  This seems like a

6    search for a dispute where none currently exists, and we should

7    be focused on getting discovery done, not the process piece of

8    it.

9              THE COURT:  So I agree with Mr. McLaughlin.  I think

10   at this point in the litigation the parties should focus on

11   getting -- moving forward, getting documents produced, taking

12   depositions.  To the extent that plaintiffs feel after

13   receiving documents that there are gaps or there are issues or

14   reasons to be concerned about defendant's preservation efforts,

15   then plaintiff can revisit these issues or requests, but at

16   this stage, I agree that I don't see the need to go back in

17   time and to figure out how preservation was done.

18             I think it sounds like defendants through -- are

19   working through these various interrogatories and issues will

20   be providing information about the source of information, what

21   databases are being searched, all of that is part of the ESI

22   protocol production.  To me that, at least in the first

23   instance, should be sufficient.

24             But again, Mr. McInturff, if after reviewing the

25   documents and getting further into discovery you have reason to

1    believe that there are data preservation issues that impede

2    your ability to proceed with the case, then raise it with the

3    Court.

4            MR. McINTURFF:  Okay.  Thank you, your Honor.

5            Okay.  I'll move on to the next issue.

6            This is item number three in the letter ECF 77.

7    We've asked for two discrete pieces of information for the

8    custodial email accounts, the date range of available emails is

9    what's still outstanding.  Defendants have disclosed the amount

10   of data in the email, but they're not telling us the date

11   range, whether there's been any -- critically whether there's

12   been any restriction on the date range of emails collected.

13           And, then, second, from the shared drives, we've been

14   asking for Hop to disclose any limitations that it imposed on

15   its collection of data or intends to impose on its collection

16   of data from the share drives, the total volume of data

17   collected, and then the total volume of any data Hop has

18   available but it intends to exclude from its collection.

19           Again, this is in the context that the parties have

20   agreed to negotiate custodial and noncustodial data sources,

21   and without this information you can't really have a

22   negotiation if you don't understand what your counter-party is

23   doing to limit the available universe of ESI.

24           And I will also note this has taken almost -- or it

25   queues very closely to item 6(a) in your Honor's model ESI

1    order, which requires parties to discuss limitations on the

2    fields or file types to be served and specifically date

3    restrictions.

4         We think that this is information that should have

5    been disclosed long ago, especially since, for several weeks

6    now, both parties have been operating under the understanding

7    that we're going to be negotiating custodial and noncustodial

8    data sources.

9         THE COURT:  Okay.  So Mr. McLaughlin, I thought some

10   of this looks like you were providing; what are you not willing

11   to provide?

12        MR. McLAUGHLIN:  Yeah, and I thought we just -- I

13   thought what your Honor just recited addressed the remaining

14   issues that were set forth in the letter motion.  But we have

15   not -- I mean, we have provided -- the exhibit that I attached

16   to my response provides the amount of data.  We indicate that

17   we had no -- that there were no scope limitations to the ADDs

18   database, the S drive, and what is loaded, what is being loaded

19   in.  So I'm not sure what additional information plaintiff

20   thinks we owe them.

21        What our ESI protocol, which is typical, discusses is

22   once we agree on search terms and run those searches, the

23   volume of the hits is going to dictate how the parties then

24   confer about if there's a need to further narrow or place some

25   limitations.  But we are not -- we said we're not going to do

1    that in the first instance.

2          Again, this seems like just more work that is not

3    necessary for us to get to the place where we are agreeing on

4    and running search terms.  This sort of provides statistics for

5    us.  It just seems like it's getting in the way of getting the

6    work done.

7          MR. McINTURFF:  Your Honor, can I respond?

8          This is absolutely not more work and they absolutely

9    have not responded to these questions.  What we're asking is

10   what limitations you're putting on what you've collected.  They

11   said -- first of all, they haven't told us the volume of data

12   they have collected from their share drives.  They haven't

13   given us any date limitations whatsoever on the availability of

14   that data.

15         With the email that totals the overall volume, but

16   again, they haven't told us whether there are any date

17   restrictions or what the date range of available email is.

18   Somebody may have a lot of email, but it might be limited to a

19   very limited period of time, and we may need to get additional

20   custodians because of that.

21         This is -- this is -- defense counsel attached a

22   letter, which is ECF 77.2.  The only thing the letter contained

23   is saying where it collected information and how much

24   information is in the email inbox of 13 custodians.

25         Again, we're asking them to disclose to us what

1    you're doing to limit the data that you've collected before you

2    collect it.  This idea that we're going to run search terms and

3    then they're going to produce documents based on the search

4    terms, before we do that, we need to make sure that what the

5    search terms are being run on is the correct range of data from

6    the custodial and noncustodial data sources.

7              I mean, this is a very basic question about what is

8    being done to limit the collection of ESI, and there's no

9    reason defendant can't answer this.

10             THE COURT:  So let's take it in pieces.  Starting

11   with what plaintiff seeks in point one, in the first point:

12   Custodial email accounts, the name of the accounts, and the

13   date range of available emails.

14             So Mr. McLaughlin, is that something you believe

15   you've already provided?

16             MR. McLAUGHLIN:  We've given them the name of the

17   custodians, the amount of data in each mailbox.

18             THE COURT:  Okay.

19             MR. McLAUGHLIN:  So by gigabytes and bytes.  We've

20   provided that.

21             THE COURT:  And have you imposed any date limitations

22   or date ranges for any of the available emails?

23             MR. McLAUGHLIN:  No.  We've collected everything, but

24   we haven't run searches in it.  So I have not said, well, this

25   employee has emails going back to 2005, and this employee has

1    emails going back to -- and we have said we would not impose

2    any date restrictions.

3             MR. McINTURFF:  Yeah, but they're not --

4             THE COURT:  Okay.

5             MR. McINTURFF:  They can tell us when, they can look

6    at the email inbox and tell us the available date of the email

7    that they've collected.  That's what we're asking.

8             Like they've got in their email, they've got this

9    range of data, but they can't tell us, you know, for the first

10   person, their email goes from November 2017 to the present.

11            That's the issues.  We've been asking for the date

12   range repeatedly.

13            THE COURT:  So Mr. McLaughlin, is that something

14   you're able to do within each custodian that you provided

15   assess big picture whether -- what the date range is covered by

16   that custodian is?

17            MR. McLAUGHLIN:  Yes.  I imagine our vendor can tell

18   us the earliest email and the latest email for each of these.

19            THE COURT:  So I think that seems to be pretty

20   straightforward and simple, and it seems like something you

21   should be able to provide as part of your negotiations so that

22   you can short circuit any issue of whether defendants

23   believe -- that plaintiffs believe that that will be -- that

24   it's not hitting the date range that they need and, therefore,

25   need to seek other custodian who might.

1              I think that's the issue, which I understand.  It
2    doesn't sound like it's a burden for you to figure out just the
3    earliest date of an email and the last date of an email.  So I
4    suggest defendants provide that as part of the other
5    information you have already provided.

6              In terms of ESI collected from shared drives, so
7    that's the next issue.  Plaintiffs want to know if there were
8    any date limitations imposed.

9              It sounds like the answer is no; is that correct,
10   Mr. McLaughlin?

11             MR. McLAUGHLIN:  Correct.

12             THE COURT:  And in terms of the total volume of data
13   collected, that's something you provided as well?  Or not?

14             MR. McINTURFF:  No.

15             MR. McLAUGHLIN:  I thought we had, but I thought it
16   was (indiscernible) I'm not seeing that specific information,
17   but again, it's -- we're not imposing any limitations.

18             THE COURT:  Right.

19             MR. McLAUGHLIN:  So it's whatever we have, we have.
20   I don't know why it matters if it's -- the volume is the
21   volume.

22             THE COURT:  Right.  No, I agree that I don't know
23   that it matters, but I guess to the extent plaintiffs want it,
24   I wonder is it burdensome for you to just tell them what that
25   is?  It seems you were able to do that for the custodial email

1  accounts without issue.

2        MR. McLAUGHLIN:  I believe, yes, we can ask the

3  vendor what they've collected, what's the total volume of the

4  share drive.

5        THE COURT:  Okay.  Then the next issue that plaintiff

6  is seeking is the total volume of data that Hop intends to

7  exclude.

8        What do you mean by that, Mr. McInturff?  Do you mean

9  whether they intend to exclude anything before applying search

10  terms or after?

11        MR. McINTURFF:  Correct, correct.

12        THE COURT:  Okay.  It sounds like the answer is no,

13  right?  There are no limitations to that; is that correct

14  Mr. McLaughlin?

15        MR. McLAUGHLIN:  Correct.

16        THE COURT:  Okay.  So it seems like this is a

17  non-issue that is easily resolved.  Most of the information has

18  already been provided by Mr. McLaughlin except for identifying

19  sort of the date range of available custodial emails, which

20  Mr. McLaughlin has agreed to do.

21        MR. McINTURFF:  Okay.

22        THE COURT:  Okay.  Then we move on to the litigation

23  hold question.  Is that the next issue?

24        MR. McINTURFF:  Yes, that's the last issue.

25        All we're asking here is for the identity of the

```
 1   litigation hold recipients and the dates that the holds were
 2   issued.  And there's twofold.  The reason is twofold for this.
 3   And again this -- we started requesting this in July of this
 4   year.
 5           The first reason we requested it was because, again,
 6   we were told by prior counsel that only one litigation hold was
 7   issued, and it was issued to a subcontractor.  So we
 8   immediately asked that they provide additional information
 9   about the litigation hold.
10           And then the second item is litigation hold
11   information is commonly disclosed in ESI negotiations as
12   reflected in your Honor's model ESI order, because it is
13   something that is commonly used by the receiving party to
14   negotiate custodian.  If you look at the defendant's proposal
15   as to which custodian's emails to collect, they have proposed
16   certain custodians, but the information on the litigation hold
17   will allow us to get a sense of other additional custodians to
18   propose, which we haven't yet.
19           THE COURT:  So do you have some reason to believe
20   that you haven't properly identified the correct ESI custodians
21   at this point?
22           MR. McINTURFF:  Oh, well, we haven't identified any.
23   Are you saying do I have reason to believe the defendant --
24           THE COURT:  I get it.  Exactly.
25           So do you have any reason to believe at this stage
```

1    that -- they give you a list of ESI custodians, do you have any

2    reason to believe that that custodian list is faulty in some

3    way, that it's not -- that there are other people that are

4    missing that would have gotten a litigation hold and they're

5    not included?

6            MR. McINTURFF:  Well, I mean that's sort of -- that's

7    sort of the unknown unknown.  You know, there's two unknowns.

8    There's who got a litigation hold that should have been

9    included, which is why we ask for the litigation hold, but in

10   addition, the parties have agreed in the ESI protocol to

11   negotiate custodians.

12           You know, we quoted former Magistrate Judge Francis

13   in the Southern District in our letter where he notes that

14   transparency transcends cooperation, because without

15   transparency, we don't know.  I can't pick up the phone and

16   call Hop and find out if there's individuals that we believe

17   should have been included in the custodian list.  And these

18   types of disclosures behoove all parties so that we can get

19   this done once, and we don't have to then, you know, get an

20   email production, review the email, and start going back

21   multiple times and having fights about, you know, which

22   custodians, adding custodians.

23           And that's why, you know, traditionally in ESI

24   practice, you front-load disclosures like this.  And again,

25   this is -- this is something we've been asking for since July.

1          THE COURT:  Okay.  So looking at -- I take your

2    point, Mr. McInturff.

3          I'm more persuaded by the reasoning of Judge Cott in

4    the *Frank* case that defendant cited, which is particularly on

5    point here, because I think we're not addressing an issue where

6    there is alleged spoliation or at this point inadequacies in

7    production because you haven't received the documents yet.  So

8    you don't have the reason to think that the production will be

9    inadequate at that stage.

10          You have identified through a meet-and-confer process

11    potential custodian, and the defendants seem willing and able

12    to provide you with information about who they are, the volume

13    of data and the like.

14          To me, having defendants get into litigation holds

15    information with the sole purpose of assisting you to identify

16    whether are there are other ESI custodians, isn't necessary at

17    this stage and it seems that that information can be more

18    easily obtained through the meet-and-confer process and

19    discussions with counsel.

20          I take Mr. McLaughlin at -- I take it that he takes

21    his obligation seriously to produce responsive documents to

22    identify ESI custodians who have discoverable and responsive

23    information, and it wouldn't serve his purposes either to not

24    include individuals in that search to which a litigation hold

25    would have been provided.

1          So at this stage, I don't believe that we should get

2     into the weeds of metadata of litigation holds because I don't

3     think the need exists to get you to where you need to be, which

4     is identifying the proper ESI custodians, which you're in the

5     process of doing already.

6          If at some point, however, you have reason to believe

7     that there are issues, inadequacies in the production, or

8     spoliation issues, or that all of the custodians that you've

9     received are inadequate for some reason, then we can revisit

10    this issue.

11         MR. McINTURFF:  Okay.

12         THE COURT:  Are there any other issues that need to

13    be addressed today?

14         MR. McINTURFF:  No, that's it, your Honor.  Thank you

15    very much for your attention to this matter.  We appreciate the

16    time you've dedicated.

17         THE COURT:  So as I understand it, by the end -- by

18    Friday, November 10th, the parties will submit a joint letter

19    about the status of your ESI discussion, the sampling that we

20    discussed.

21         As part of that letter, you should also include the

22    general status update about the outcome of the Court's rulings

23    and how the parties are making their way through negotiating

24    the rest of the ESI protocol.

25         MR. McLAUGHLIN:  Will do, your Honor.

Angela O'Donnell - Official Court Reporter
(914)390-4025

```
1              THE COURT:  Okay.  Great.

2              And so we will adjourn and, if necessary, I'll set

3    another conference after receiving the parties' submission on

4    November 10th.

5              MR. McLAUGHLIN:  Thank you, your Honor.

6              MR. McINTURFF:  Thank you.

7              THE COURT:  Thank you.  Have a good day.

8              MR. McLAUGHLIN:  You too.

9                            o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```